| 60 | 451 |
| 68 | 509 |
| 60 | 451 |
| f125 | 418 |

### DAVID P. CLAY v. THE CITY OF GRAND RAPIDS.

*Street improvements—Power of city council—Natural water-way—Sewerage, how provided for—Assessments for local improvements—Theory of— Taxes and assessments should be laid on principles of justice and equality.*

1. July 10, 1869, the owners platted certain land covering a part of the old bed of the east channel of Grand river, as an addition to the city of Grand Rapids; in the progress of their improvements, this channel was brought within a timbered way or race, partly within and partly without projected streets, it being agreed that it should be kept as a water-way for drainage, and for the discharge of water needing such an outlet. This channel crossed Campau street diagonally, and *this* portion was confined in a timbered trunk, the top of which was about sixteen feet below the street level.

In 1875 the city authorities graded, leveled, and paved Campau street in the usual way, under the city charter, leaving this timbered trunk undisturbed, and filling in the street above and around it; and thereafter various public sewers and drains were discharged into it.

In 1882 a break occurred in the timber covering of this trunk, in one of the gutters in Campau street, causing a caving in of a portion of the street, and interfering with travel thereon. Such action was thereupon taken by the city council as resulted in the construction of a *brick* sewer in Campau street, *within* said timbered trunk, the bottom and sides of which were not disturbed. A "sewerage district" was located, "to be assessed for the grading, leveling, repairing, amending, and graveling of Campau street"; and resolutions were passed charging the expense of the proposed improvement upon such district. Complainant is the owner of a portion of the land platted in 1869, having a frontage of one hundred feet on Campau street, and within said sewerage district, and was assessed five hundred dollars towards said improvement. He refused payment of the

tax, and his land was sold therefor; whereupon he filed a bill to set aside the proceedings.

*Held*, that while the city council attempted to bring this work within the definition of a *street* improvement, the brick structure built was a sewer in fact, and that it is not competent to change the *character* of things by changing their *names*.

*Held*, further, that every subterranean ditch or water passage is not to be treated as a part of a highway merely because it crosses the same ground, any more than a structure elevated above and passing over a road is to be confounded with the road itself.

*Held*, further, that while it is possible for a necessity to arise for going below the surface of a street to repair the street itself, yet, where the main purpose of the work is to put in order and improve some permanent structure *beneath* the street, it is an abuse of words to confound such *structure* with the common highway above it; but that what may be necessary to put the *surface* in order after the subterranean work is done, may, perhaps, be street repairs.

*Held*, further, that there is nothing in the nature of a sewer which excludes it from being made, in whole or in part, out of a natural water-way, and that such is a very common practice; nor is sewerage necessarily, if it is generally, intended merely as an escape for filthy water, but includes all kinds of drainage and water discharge.

*Held*, further, that when the city made an outlet for its sewerage into this covered way, it became bound to do its part to keep it open for that purpose; and when it undertook, not only to repair, but to change and renovate it by putting it into the form of a permanent arched and vaulted passage, it was *building a sewer*, and *not repairing a street*.

2. The whole theory of a legal assessment for local improvements depends upon a *uniform* rule of charges within some defined district, and resting on some principle which is intelligible; and an assessment which throws the whole of a costly work upon a frontage of only one hundred and forty feet, in a long street, is a very *peculiar* exercise of the power of creating assessment districts, and is *solitary* in the experience of the Court.

3. It is the duty of all public corporations to see that taxes and assessments are laid on principles of justice and equality, and that *private* persons shall not be compelled to assume *public* burdens. In this case, if the work was a proper one, it was the duty of the city council to build the sewer under its *right* name, and make the *public* pay for it by the method of taxation appropriate to it, and not to lay the cost on property which is, apparently, less benefited than the large outside district drained by it.

Appeal by defendant from the Superior Court of Grand Rapids. (Parrish, J.) Argued February 19, 1886. Decided

April 8, 1886. Decree affirmed. The facts are stated in the opinion, and in head note 1.

*John E. More,* for complainant.

*J. W. Ransom,* for defendant.

CAMPBELL, C. J. Complainant owns property having a front of 100 feet on Campau street, at the corner of Lyon street, in Grand Rapids. Many years ago this, and other property near by, was platted as the Island Company's addition, and covered in part the old bed of the east channel of Grand river. In the progress of their improvements the owners brought that channel within a timbered way or race, partly within and partly without projected streets, it being agreed that it should be kept as a water-way for various purposes, including the common uses to which such a channel is adapted, and especially for drainage and the discharge of water needing such an outlet. Among other purposes, it was utilized as a tail-race, discharging below the rapids.

In the neighborhood in question the bed of this channel was very much below the surface, the top of the trunk which confined it being about sixteen feet below the street level. Where it passed through Campau street it was confined in a timber trunk, having timbered bottom, sides, and cover, enclosing a space of between twelve and thirteen feet wide and six feet high (if the scale in the record as furnished us is correct), and the timbers being heavy.

In 1875 the city authorities assumed the improvement of Campau street, and graded, leveled, and paved it in the usual way, under the city charter, leaving this trunk undisturbed, the street being filled in above and around it, and various sewers and drains have been discharged into it, the Lyon street sewer emptying into it at the junction of Lyon and Campau streets. The channel is not along the middle of the way, but runs diagonally, entering at one side and leaving some distance down on the other.

In the early fall of 1882 a break occurred in the timber covering of this trunk in Campau street, under one of the

gutters, which led to the caving in of a considerable part of the street, interfering with passage.  In October the council began to consider the question of repairing the mischief, and, on the sixth of November, passed a resolution that the "grading, leveling, and repairing, and amending, and graveling" of Campau street, between points 50 and 100 feet south of Lyon street, "including the construction of the necessary bridges, culverts, and paved gutters therein, is a necessary public improvement."

On the thirteenth day of November, 1882, as appears of record, Mr. Thayer, president of the board of public works, "being present, made a verbal statement relative to the sewer which runs under Campau street, and recommended that the council reconsider certain portions of the resolution as passed one week ago, and pass a resolution which would construct a brick sewer in said street, to take the place of the timbers which cover the said sewer."  Thereupon Alderman Follett moved to "rescind the resolution as offered and passed one week ago relative to the break in the sewer in Campau street."  This was carried, and a new resolution adopted, which used the language of the old one, except that it covered the space between 10 and 140 feet south of Lyon street.

On December 26, 1882, a committee was appointed to "locate a district to be assessed for the grading, leveling, repairing, amending, and graveling of Campau street."  This committee reported January 2, 1883, fixing a district from Lyon street to 140 feet south, and extending back 100 feet from Campau street, and their report was adopted.  For some unexplained reason this action was rescinded on the twenty-ninth of January, 1883.  On that day it is entered that the board of public works "presented the estimate of cost of the improvement of the break of the sewer in Campau street, which was accepted and placed on file."  What this was does not appear; but on the third of February there was filed a document, approved by the board of public works on February 3d, which purports to be an "estimate of the cost of the improvement of Campau street, as follows: Con-

tract price, $990; assessment and printing, $50; incidentals, $130,—$1,170."

On February 19th the same special committee made again precisely the same report as to a district, and resolutions were passed charging the expense on that district, and ordering assessments, which were made by the board of review. Complainant, I. M. Weston, A. B. Watson, and Martin L. Sweet appealed from the assessment,—the three former on the grounds of illegality and inequality, the assessment not being made on any basis of equality among the parties benefited. The result of this appeal was the removal of $100 of Mr. Sweet's assessment, so as to add it to the assessments of complainant and Mr. Watson, who were made to bear between them nearly the whole cost of the work, complainant's share being $500 and charges. He did not pay it, and the marshall returned the assessment unpaid, and the city sold the property, and bid it in. This bill was filed to set aside the proceeding for several alleged grounds of fraud and illegality.

The contract, which was made November 20, 1882, provided for putting the street in repair on the same grade and level, and in the same manner, as before. It appears from that instrument and the specifications that the surface repairs included only forty feet of the east gutter, while the subterranean work extended ninety-five feet, and included a brick arch of eighty inches interior span, and sixteen-inch walls, backed by a stone wall three feet thick and sixteen inches high. All this was done within the old trunk, the bottom and sides of which do not appear to have been disturbed, so far as the record shows. How far the timber covering outside of the break was left does not appear.

There are several questions of practical moment arising out of the charging of this expense to the small district named, assuming it to have been a case of simple street repairing. The whole theory of a legal assessment depends upon a uniform rule of charges within some defined district, and resting on some principle which is intelligible. The assessment in question, which throws the whole of a costly work upon a frontage, in a long street, of only 140 feet, is certainly a pecu-

liar exercise of the power of creating districts, and is solitary in our experience of such matters. But a more serious question is raised as to the character of the work itself. If it is a work of sewerage, there is no pretense that such an assessment is lawful under the city charter or under any known rule of law. That question is therefore to be disposed of first.

It is easily to be seen that the council went to a good deal of trouble to bring this work within the definition of a street improvement, and there seems no other reason for some of the steps taken, which, so far as anything appears on the face of the record, did the same thing twice over in precisely the same way. But it is not competent to change things by changing their names. A sewer is not changed into a bridge or culvert by calling it by one of those names. Neither is every subterranean ditch or water passage to be treated as a part of a highway merely because it passes or crosses the same ground, any more than a structure elevated above the surface and passing over a road is to be confounded with the road itself. It is no doubt possible for a necessity to arise for going below the surface of a road to repair the road itself; but where there is some permanent structure beneath it which it is the main purpose of a work to put in order and improve, it is an abuse of words to confound that structure with the common highway above it. What may be necessary to put the surface in order after the subterranean work is done, may, perhaps, be street repairs.

It appears from the documents laid before the common council before their action that the original consent of landowners to the platting of the land where this street is, was given upon the condition imposed by some of them that a proper sewer should be put in before filling up the ground; and, in one instance, that a " proper sewer or channel " should be built, capable of carrying off the waste water from a tailrace requisite for four run of stone. It also appeared that the channel was so built in and covered with a wooden covering, at a considerable depth below the surface of the ground, as before mentioned, and continued ever since. Campau street and Lyon street, beneath which this channel ran,

were graded, leveled, and paved in the gutters by the city, as a public improvement, with this water passage so shut in, and the city connected its sewers with it.   Most of the channel outside of these streets passes across private property, and is kept in order by the owners of that.

When we look at the action of the council now complained of, two things are evident : *First*, that the channel under the streets was really regarded as a sewer ; and, *second*, that there was an attempt made to avoid the force of that recognition, which led to inconsistent action.

The first action, referring it to the city attorney to report what action was necessary, recited a break in the east gutter, caused by the " breaking in the overflow to the Butterworth tail-race, so called."   There is nothing in either of the resolutions under which action was finally had which would indicate on their face that there was any work to be done beyond common highway repairs.   But when this resolution was rescinded it was done under a motion which called it a resolution " relative to the break in the sewer in Campau street."   This rescission was had upon the recommendation of the president of the board of works that the council pass a resolution " which would construct a brick sewer in said street, to take the place of the timbers which cover the said sewer."

The original resolution was upon the basis, sustained by proof, that only fifty feet in length upon the street need be disturbed, and this distance exceeded the length of the defective timbers.   The second resolution, passed with the real purpose of building a brick sewer, although in terms avoiding naming it, lengthened the area of repairs to 140 feet, while there is no pretense and no proof that any such extent of repairs was needed, and therefore no foundation for assessments to make them.   The plans and specifications of the work show a brick sewer constructed within the lines of the timbered channel, and when the board of public works presented their estimate it was an " estimate of cost of the improvement of the break in the sewer in Campau street." This seems to have been replaced by an estimate called; " for

the improvement of Campau street;" but it was for this same specific work, and plans and estimates were made accordingly.

It appears that the work naturally suggested to the minds of all parties that it was a sewer, and the various ingenious attempts to avoid calling it so have not removed these facts from the records of the council. Of course, names alone are not conclusive, but it is of some value to know what they really believed it to be.

There is, however, one feature of the case which seems very conclusive. If this channel was not under the care of the council, it is difficult to find any authority for changing the character of the trunk, in which the water flowed, anywhere; and it is impossible to find any charter or other authority for building at all in that part which was not out of repair, or for building a smaller brick sewer in place of the larger one already built and provided before the street was opened, and extending the new structure the whole distance of ninety-five feet under the highway. If they had any right to build this structure as they did, it could only be as a sewer. There was no other reason or pretext for it.

And it is plainly a sewer in fact. There is nothing in the nature of a sewer which excludes it from being made, in whole or in part, out of a natural water-way. Such is a very common practice, and the sewerage, under the ancient system of the English sewer commissioners, was chiefly in natural streams, which were variously improved or confined for the purpose. Neither is sewerage necessarily, if it is generally, intended merely as an escape for filthy water. It includes all kinds of drainage and water discharge. When the city made an outlet for its sewerage into this covered way it became bound to do its part to keep it open for that purpose; and when it undertook, not only to repair, but to change and renovate it by putting it into the form of a permanent arched and vaulted passage, it was building a sewer, and not mending a road.

It is the duty of all public corporations to see that taxes and assessments are laid on principles of justice and equality, and that private persons shall not be compelled to assume

public burdens. The language of charters is sometimes care-
lessly drawn, and may, if interpreted literally and without
reference to legal rules, involve extravagant powers. But
all such language should be, if possible, so construed as to
bring the powers within the constitutional safeguards, which
the Legislature cannot violate, and will not be supposed to
design violating. If a city council can do one thing and call
it something else, so as to confound roads with sewers, and the
repair of one with the building of the other, there is no safety
to citizens against the grossest usurpations and injustice. It
would be hard to find a plainer illustration of the danger than
is supplied by this case. If the work was a proper one, and
very probably it was, it was the duty of the common coun-
cil to build it under its right name, and make the public pay
for it by the method of taxation appropriate to it, and not to
lay the cost on property which is, apparently, much less bene-
fited than the large district drained by it outside.

The whole proceedings were properly held by the court
below to be illegal so far as the assessment was concerned,
and the decree should be affirmed, with costs of both courts.

SHERWOOD and MORSE, JJ. concurred. CHAMPLIN, J. did
not sit, having been of counsel.