### ANSELMI ET AL. v. CITY OF ROCK SPRINGS ET AL.

(No. 2088; June 24, 1938; 80 Pac. (2d) 419)

224

For the plaintiffs and appellants, the cause was submitted on the brief of *Glen G. Stanton* of Rock Springs.

For the defendants and respondents, the cause was submitted on the brief of *Edwin V. Magagna* of Rock Springs, Wyoming.

BLUME, Chief Justice.

This is an action brought by taxpayers of the City of Rock Springs to declare invalid certain bonds, in the sum of $75,000, proposed to be issued by the said city. The court sustained a demurrer to the petition, and plaintiffs refusing to plead further, judgment was entered for defendants, and plaintiffs have appealed. It appears that on October 13, 1937, the Mayor and City Council of Rock Springs passed and approved ordinance No. 537 to the effect that a special bond election should be held in the city in order that the electors might determine whether or not the city should be authorized to borrow money and issue its Coupon bonds in the sum of $75,000, for the purpose of making improvements in "Storm Ditch" and the channel of Bitter Creek, to prevent and dispose of flood water. Notice was directed to be duly published. This notice, duly published, in so far as material herein, is as follows:

"By virtue of Ordinance No. 537, passed and approved and published by the Mayor and Council of the City of Rock Springs, Wyoming, on Wednesday, October 13th, A. D. 1937, there will be submitted to the electors of the City of Rock Springs, at a special bond election to be held on Tuesday, November 2, A. D. 1937, the proposition whether or not the City of Rock Springs, in the State of Wyoming, and the Mayor and Council of the City of Rock Springs, Wyoming, shall be authorized to borrow money, and issue the coupon bonds of said City, in the amount of Seventy-Five Thousand Dollars ($75,000.00), and not exceeding, at any one time, when computed together with outstanding general bonds 2% of the assessed valuation of said city, for the purpose of making improvements in "Storm Ditch" and channel of "Bitter Creek" to prevent flood damage and for the purpose of making improvements to dispose of flood waters within the City of Rock Springs."

The ballots submitted to the electors substantially embodied the provisions in the foregoing notice.

The election was duly had pursuant to notice, and the bonds were duly authorized to be issued by a large majority, both of the property owners as well as of the non-property owners. It appears that on December 6, 1937, the City of Rock Springs accepted the bid of the Stockgrowers National Bank for the purchase of the bonds in the amount above mentioned, and intends to issue the bonds to the bank unless prevented by the court from doing so; that the assessed valuation of the city is the sum of $4,943,676; that the present bonded indebtedness of the city already is in the sum of $192,000, some of the bonds having been issued for sewer purposes.

Section 5 of Article 16 of the Constitution provides that:

"No city, town or village, or any sub-division thereof, or any sub-division of any county of the state of Wyoming, shall, in any manner, create any indebtedness

exceeding 2 per centum on the assessed value of the taxable property therein; provided, however, that any city, town or village may be authorized to create an additional indebtedness, not exceeding 4 per centum on the assessed value of the taxable property therein as shown by the last preceding general assessment, for the purpose of building sewerage therein."

Section 22-1601, Rev. St. 1931, provides that each incorporated city and town in the state shall have power to establish, construct, purchase, extend, maintain and regulate a system of sewerage. Section 22-1605, Rev. St. 1931, provides that any incorporated city or town is authorized to borrow money and issue coupon bonds in any amount not exceeding the limitation provided in Section 22-1603 for the purpose or purposes enumerated in Section 22-1601. Section 22-1603 provides that no city or town shall in any manner create any indebtedness exceeding two per centum of the taxable property therein, except an additional amount not exceeding four per centum of the assessed valuation of the property therein, for the purpose of building and construction of sewerage systems.

The question before us is as to whether or not the bonds proposed to be issued herein are for the purpose of constructing a system of "sewerage," within the contemplation of the constitution and statute above mentioned. If so, the proposed bonds will be within the limit of indebtedness prescribed in such cases. The term "sewerage" is usually applied to a system of sewers, and "sewage" to the matter carried off, although these terms are frequently used interchangeably. McQuillan, Municipal Corporations (2d ed.) Sec. 1640. So we must inquire whether the proposed work constitutes a "sewer" or "sewers." It is the contention of appellants that the proposed work constitutes "storm sewers"; that these are not "sewers" within the meaning of the constitution and statutes, but that the term "sewer" properly construed refers only to

sanitary sewers. It is true that at times, under special circumstances, the term "storm sewer"—which, in other words is a drain—has been held not to be included in the term "sewer." Roebling v. City of Cincinnati, 102 O. S. 460, 132 N. E. 60; City of Sand Springs v. Hohl, 90 Okl. 124, 216 Pac. 138. Originally, the word "sewer" meant an artificial conduit for water drainage, encompassed with banks on both sides to convey surface waters into the sea and thereby preserve the adjacent lands from inundation. McQuillan, supra, Section 1538. Webster's New International Dictionary, 2d Ed. ,(1935) defines the term "sewer" as (1) a ditch or surface drain; (2) an artificial, usually subterranean, conduit to carry off water and certain waste matter, as (a) surface water due to rainfall; (b) household waste, as slops, waste water from sinks, baths, etc., and excreta consisting of urine, or feces; (c) waste water from industrial works. The New English Dictionary (1914) defines "sewer" to mean: 1. An artificial watercourse for draining marsh land and carrying off surface water into a river or sea; (2) an artificial canal or conduit, usually subterranean, now used to carry waste water and the refuse from houses and towns. The National Encyclopaedia, 9, 166, (1932) states in connection with "sewerage" as follows:

"The term is more commonly used for systems conveying sewage but is also applied to 'storm sewers' intended to convey away storm water, surface water, street wash and other drainage. * * * Sewers are primary essentials to community sanitation, though storm sewers are of less importance and must be economically justified. Land otherwise occupied by natural water courses may be reclaimed by storm sewers. Combined sewers are generally economical wherever storm sewers are justified and where the sewage can be disposed of through dilution."

In the New International Encyclopaedia, 2d Ed., Vol. 20, p. 757 (1916) it is stated:

"In most of the larger cities provisions for surface drainage preceded the introduction of sanitary sewers. Convenience gradually led to the use of these surface or storm sewers for the disposal of liquid and then of solid house wastes, the connections for the latter purpose often being surreptitious at first. As public water supplies were introduced and the per capita water consumption greatly increased, the disposal of the water thus brought into the houses often became even more serious a matter than the removal of surface and ground drainage. This led to the construction of sewers on the combined plan."

It seems accordingly, that the term "sewer" as meaning a storm sewer was in general use earlier than the meaning of sanitary sewer. In the case of Aldrich v. Payne, 106 Ia. 461, 467, the court stated as follows:

"Our attention is called to the statute giving the town authority to grade and repair streets and alleys and to construct sewers, and requiring that it shall defray the expenses of the same out of the general funds of such city or town. Code of 1873, Section 465. This refers to the building of sewers along the public streets and alleys for the purpose of carrying off the surface water and filth. The right to so construct sewers is usually regarded as incident to the power of maintaining the streets. * * * The word 'sewer' does not seem to have a meaning essentially differing from 'ditch' or 'drain.' Webster defines it as 'a drain or passage to carry off water and filth underground; the subterraneous channels, particularly in cities.' It has also been applied to an underground structure for conducting the water of a natural stream. * * * In Clay v. City of Grand Rapids, 60 Mich. 451, 27 N. W. Rep. 596, it is said: 'Neither is sewerage necessarily, if it is generally, intended as the escape of filthy water. It includes all kinds of drainage or water discharge.' The sewer is usually closed, but not necessarily so, and is ordinarily applied to drains in the city, whether of water or filth, or both. The difference seems to be largely a matter of location. What is a ditch or drain in the country is called a sewer in the city, and vice versa."

In the case of Clay v. Grand Rapids, 60 Mich. 451, 458, 27 N. W. 596, the court said:

"There is nothing in the nature of a sewer which excludes it from being made, in whole or in part, out of a natural water-way. Such is a very common practice, and the sewerage, under the ancient system of the English sewer commissioners, was chiefly in natural streams, which were variously improved or confined for the purpose. Neither is sewerage necessarily, if it is generally, intended merely as an escape for filthy water. It includes all kinds of drainage and water discharge."

In the case of City of Valparaiso v. Parker, 148 Ind. 379, 381, 47 N. E. 330, the court said:

"Formerly the word sewer was defined to be a fresh water trench artificially made, encompassed with banks on both sides to carry surface water into the sea. Callis on Sewers, 80; 1 Crabb, Real Prop., Sec. 113; Woolrych's Law of Sewers, p. 1. Webster defines 'sewer': 'A drain or passage to carry off water and filth under ground.' For sewerage or sewage the definition given is: 'The general drainage of a city or town by means of sewers.' For drain he gives: 'A trench; a water course; a sewer; a sink.' In Bennett v. New Bedford, 110 Mass. 433, the court held that a structure under ground constructed by a city not only to carry off sewage from the houses and streets, but also to conduct surface water, and the waters of a natural stream is a common sewer. It is said in 6 Am. & Eng. Ency. of Law, p. 2, that 'The word "drain" has no technical or exact meaning. As generally understood, it means an artificial channel or trench through which water or sewage is caused to flow from one point to another. As generally understood in law the term "sewers" has reference to the underground canal or passage by means of which cities are drained and the filth and refuse liquids are carried to the sea, river, or other place of reception.' It may be true that when the term drainage is used with reference to lands, that ordinarily drainage of waters is intended, but it is clear that when that term is used with reference

to a city or town it includes sewerage, that is, such drainage is and may be used for the removal of surface and storm water, the overflow of fountains, cisterns, public hydrants, water-troughs, water-closets, sinks, all filth and refuse liquids, and the diversion of natural water courses."

In the case of Pioneer Real Estate Company v. City of Portland, 119 Or. 1, 247 Pac. 319, the city proposed the construction of a system of sewerage. The ordinance stated that it was intended to act as a large drain for surface drainage as well as for intercepting all of the sewers from the west used for sanitary sewers as well as surface drainage. This power was sought to be exercised under the provisions of a statute granting the city the power to construct a sewerage system. Plaintiff sought to restrain the construction thereof but the power to do so was upheld, the court saying in part:

"The authority conferred upon the city of Portland to construct a sewerage system for the purpose of protecting the public health carries with it the essential power to build a system that will effectuate the purpose contemplated. In support of its action the city has adduced much evidence from civil engineers and others to the effect that, in order for the sewer to carry the sewage from the district described in the ordinance, it is necessary that the flood waters of the Willamette river be excluded therefrom; further, that the pumping plant is an essential, as is also the fill. It plainly appears from the record that the city of Portland is face to face with the problem of draining the sewage from a locality affected by backwater, seeping waters, and flood waters at each recurring freshet. The city is confronted with the indisputable fact that it is impossible effectually to sewer the property embraced within the ordinance without excluding the waters therefrom."

See also Barton v. Drainage District, 174 Ark. 173, 294 S. W. 418; Clinton v. Spencer, 250 Mich. 135, 229 N. W. 609.

None of the foregoing cases are exactly in point herein. But sufficient appears so that we are unable to say that the term "sewer" does not include a storm sewer as well as a sanitary sewer, unless we find something in the constitution or the statutes of this state which would limit the term to sanitary sewers. But we find nothing of the kind. The statute authorizing the construction of a system of sewerage and permitting the issuance of bonds for that purpose was originally adopted in 1890, shortly after the adoption of the constitution, and presumably therefore the term "sewerage" used therein was intended to mean the same as it means in the constitution. The term "storm sewer" is not and never has been used in the constitution or statutes of this state. The term "drain"—probably synonymous, as above stated, with "storm sewer" —did not appear in any of the statutes of this state until 1909. In Chapter 51, Section 1, S. L. 1909, relating to cities of the first class, the statute speaks of drains *or* sewers, apparently considering these terms as synonymous. In Section 29 of the same act, however, reference is made to the repair and use of sewers *and* drains. Chapter 120 of the Session Laws of 1915 provided that the term "drains" or "drainage" should not include sanitary sewers. But we should primarily examine the statutes existing at the time of the adoption of the constitution. We have done so. The various special charters of cities and towns of this state, and the statutes relating to cities and towns incorporated under the general laws of this state, all provided that these cities and towns should have power to construct "sewers." The term "drain" (or "storm sewer") does not appear therein. This seems to indicate that at that time the term "sewer" included a storm sewer as well as a sanitary sewer. And bearing in mind that storm sewers may subserve the purposes of health as well as sanitary sewers, we think that under the fore-

going authorities we are constrained to hold that they were included within the constitutional and statutory provisions above mentioned, and that the general bonds of the city may be issued therefor, as is proposed to be done in the instant case.

It is alleged in the petition and admitted by the demurrer, "that the notice to the electors of Rock Springs, and the ballots prepared by the city clerk and used in said election, contained the statement that said bonds to be voted on, when computed with the outstanding general bonds, would not exceed at any one time 2% of the assessed valuation of said city, which said statement was misleading to the voters, due to the fact that when computed together with outstanding general bonds, said bonds would exceed 2% of the assessed valuation of said city." That point presents a much more difficult question than the one already considered. The total bonded indebtedness of the city at that time was, according to the petition, nearly 4% of the assessed valuation and will be approximately 5½% when computed together with the proposed bonds, so that if the foregoing statement was intended to mean what it apparently means, it is hard to understand how such error crept in. And if we were satisfied that the electors of the city were actually misled, our duty would be clear to declare the bonds invalid. Counsel for the city contends that a statement of the total indebtedness is not required and that the bonds cannot accordingly be held to be invalid on account of the error. It is correct that the statute does not require such statement. Section 22-1605 provides that "the proposition so submitted shall specify the amount of bonds proposed to be issued, the rate of interest, and the purpose for which it is proposed to issue the bonds. At any such election the official ballot shall contain the words: 'For _____ Bonds,' and 'Against _____ Bonds.' " The notice and the ballots in the case at bar complied

with these provisions. We are not prepared to hold that statements contained in a proposition, which are not required by the statute, will always be considered immaterial. A number of cases hold that if the proposition contains conditions or terms (not required by statute) under which bonds are to be issued, they cannot be issued contrary thereto, and if these terms or conditions are invalid, the bonds are void. Note 93 A. L. R. 362; Mann v. City of Artesia, 42 N. M. 224, 76 Pac. (2d) 941, and cases cited. We do not, however, have such a case before us, and the cases holding as stated are not controlling herein, although we are not unaware of the fact that they furnish one of the lines of reasoning by analogy herein.

It has been laid down as a general rule that the question submitted to the people for their vote, and the notice thereof must not be misleading. McQuillan, supra, sections 2356-57; Neacy v. Milwaukee, 142 Wis. 590, 126 N. W. 8; 44 C. J. 1198. The cases cited generally deal with points required to be submitted by the statute, and so are not of a great deal of help herein. If our statute had required that the notice or the ballot should state the amount of existing indebtedness, that provision would be held to be mandatory, and in that event the error appearing herein would be considered fatal. McGuire v. Philadelphia, 245 Pa. St. 307, 91 Atl. 628. In the case just cited the court stated that such requirement is a wise provision, enabling the electors to act intelligently and prudently. However, the legislature, for reasons doubtless deemed sufficient, has not made such requirement. The erroneous statement herein is in the nature of an inducement to vote for the bonds, and we cannot, we think, consider it in a light other than that of an irregularity merely. No fraud or intention to mislead is claimed. It has been held that courts must, as a rule, whenever possible, uphold the validity of municipal bond elections. In Re

Validation etc., 196 Cal. 725, 239 Pac. 38; Bullitt v. Louisville, 213 Ky. 756, 281 S. W. 1031. Thus unnecessary and immaterial provisions in a notice have at times been treated as surplusage. City of Santa Barbara v. Savis, 6 Cal. App. 342, 92 Pac. 308; Bell v. City of Shreveport, 127 La. 691, 53 So. 928; Chostkov v. Pittsburgh, 177 Fed. 936; Parkinson v. School Dist., 28 Wash. 335, 68 Pac. 875; People v. Omaha, 113 Neb. 463, 203 N. W. 588; State v. West Palm Beach, (Fla.) 174 So. 334. Hence McQuillan, supra, sec. 2506, lays down the general rule that "a bond issue will not be restrained * * * for mere irregularities in the election conferring authority." See also Jones, Bonds and Bank Securities, Sec. 220. While some of the cases have stated that to be the rule under certain circumstances, other authorities state the rule somewhat differently. Dillon on Municipal Corporations, (5th Ed.) Sec. 374, states that "it is a canon of election law that an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election. Courts are anxious rather to sustain than to defeat the popular will." That rule is sustained by numerous cases. See McQuillan, supra, sections 430 and 2361 and cases cited; Hendricks v. School District, 44 Wyo. 204, 10 Pac. (2d) 970.

That is the rule which, we think, is applicable under circumstances disclosed in the case at bar. The question then remains whether we are authorized to presume that the election was affected by the error herein, or whether the burden in that respect is on the plaintiffs—the appellants here. It is said in 20 C. J. 238 that "the presumption is in favor of the legality of the election." McQuillan, supra, sec. 2361, states that "all presumptions are in favor of the validity of the election, and as said above, it will not be vitiated by mere irregularities."

In McKinnon v. High School District, 116 Or. 543, 241 Pac. 386, it appears that more than one ballot had been delivered to some of the electors. It was held that the burden was on petitioner seeking to have bonds declared void to show that this affected the results of the election. The holding was the same in a case in which the notice wrongly declared the qualifications of the electors (Kent v. School District, 106 Okla. 30, 233 Pac. 431); also in a case in which part of the notices stated the rate of interest wrongly (In Re Special Election, 183 Minn. 542, 237 N. W. 412); also in cases in which illegal votes had been received (Sargent v. Santa Fe, 24 N. M. 411, 174 Pac. 424; Dillon, supra, Sec. 376); also in a case in which certain men had been wrongly selected as judges of election (Mack v. School District, 200 Iowa 1190, 206 N. W. 145); also in a case in which the petition for the bond election and the notice thereof were alleged to be insufficient (Sykes v. School District (Tex. Civ. App.) 14 S. W. (2d) 124). See also Williams v. Glover (Tex. Civ. App.) 259 S. W. 957; McQuillan, supra, Sec. 2361; Jones, supra, Sec. 215; Moon v. Alred (Tex. Civ. App.) 277 S. W. 787, 789.

It appears in State v. Salt Lake City, 35 Utah 25, 99 Pac. 255, 18 Ann. Cas. 1130, and Allison v. City of Phoenix, 44 Ariz. 66, 33 Pac. (2d) 927, 93 Am. L. Rep. 854, that the statute provided for an annual tax to be levied to pay the interest and sinking fund of the bonds proposed to be issued by the city. The question submitted to the voters, however, provided for the establishment of a special fund to be raised from sources other than from taxation. The claim was made in those cases, as in this, that the statement was misleading. It was held that unless it appeared that voters were actually misled, the irregularity should not be held fatal to the validity of the bonds. The court in

the Utah case, quoted from and approved in the Arizona case, stated as follows:

"But if we should assume that the statement was in the nature of an inducement to the voters of which they may complain, then it constitutes what is termed an irregularity. It certainly cannot be said to be more than this. And as we have seen, it is not a matter that could have been submitted to a vote or voted upon at the election. Nor was it an irregularity in the proceedings, either before or at the election. It, therefore, was a matter which, if it had any effect at all, must be considered in the nature of an inducement to the voters to vote for the bonds. But there is no allegation or intimation even that any of the voters were in fact induced to vote for the bonds that otherwise would not have voted for them. Can an election be declared illegal because of some irregularity which it is not claimed affected the result thereof? The mere allegation that an irregularity occurred is not sufficient to authorize a court to declare the election illegal. If the matter complained of were one which in a sense were jurisdictional—that is, which went to the right of holding the election, or to its legality—the case might be different."

The foregoing was quoted with approval also in Bay County v. Hand, 257 Mich. 262, 241 N. W. 256.

Dillon, supra, Section 213, states the general proposition that "inducements in the way of statements and representations made to influence a voter, although false and fraudulent, will not invalidate the election, if it does not appear that by force and fraud the voter was compelled to vote in a way he did not desire to vote." False statements in an ordinance were recently considered by the Supreme Court of Colorado in the case of McNichols v. Denver, (Colo.) 74 Pac. (2d) 99. The facts appear in the following quotation from the case in which the court said:

"Neither do we believe there is merit in plaintiff in error's contention that the election is void because of

alleged false inducements held out to the electorate. This objection is based upon a statement in the preamble of the election ordinance of 1935, detailing the alleged benefits which would result from the establishment of an air corps technical school in the vicinity of Denver, to the effect that the federal government would invest approximately $6,000,000 on the project whereas in fact, it is pointed out the enabling act of Congress appropriates only $2,275,000."

In several cases, courts have considered the statements of officials in connection with an election, and it has been held that "misrepresentations made during a campaign by public officials or others will not vitiate an election." West Missouri Power Company v. Washington, 80 Fed. (2d) 420; City of Oswego v. Davis, 97 Kan. 371, 154 Pac. 1124; Detroit United Railway v. Detroit, 255 U. S. 171, 65 L. Ed. 570, 41 Sup. Ct. 285; State v. Waltner, (Mo.) 100 S. W. (2d) 272; Kansas Electric Power Co. v. City of Eureka, 142 Kan. 117, 45 Pac. (2d) 877, 879; Epping v. Columbus, 117 Ga. 263, 43 S. E. 803, 812; Balducci v. Straugh, 239 N. Y. S. 611. While official notices and ballots are, of course, of higher dignity than personal statements by city officials, yet the deception which may be brought about by the one or the other is but one of degree.

The petition in the case at bar fails to allege that any elector of the city was actually misled. For aught that appears every voter may have known the actual amount of existing indebtedness of the city, and may have been fully aware that the statement in that connection in the notice and the ballot was a mistake.

It may be noted that none of the authorities here cited deal directly with a situation such as is presented in this case. All that we can do is to reason by analogy. Bearing in mind the fact that voters generally are apt to give but scant attention to the details of a notice, riveting their attention on the main object thereof, and further bearing in mind that at least some of the

property owners actually and vitally interested in the amount of bonds already outstanding, would be apt to attempt to verify the statement in the notice by the records of the municipality, readily accessible, and would then call attention to the falsity of the notice, to treat the error herein as prima facie not affecting the result is, we think, more nearly in accord with the actual facts in life than a contrary course, and that fact, after all, cannot be overlooked. Hence the authorities cited which deal with irregularities generally, furnish, we think, a closer line of reasoning by analogy than any other, and we have, accordingly, thought best to defer to the conclusions reached thereby, though not without considerable reluctance. We think that when a mere irregularity appears, the presumption is and should be that the election is valid. Hence something more should appear, we think, in a case of this kind than a mere tendency of the notice or ballot to mislead. A great many irregularities might have that tendency. Something more should appear which would at least cast a doubt on the validity of the presumption above mentioned. How much more, we need not determine. We think, accordingly that the petition fails to state facts sufficient to constitute a cause of action, and that the demurrer was properly sustained. The judgment of the trial court, is, therefore, affirmed.

*Affirmed.*

RINER and KIMBALL, J. J., concur.