HERBERT L. SESSLER, *on behalf of himself and all other taxpayers of Raleigh County* v. IRA J. PARTLOW, *Acting Attorney General.*

(No. 9541)

Submitted October 26, 1943. Decided November 9, 1943.

LOVINS, JUDGE, dissenting

*Charles T. Ross* and *A. D. Preston,* for petitioner.
*Ben H. Ashworth* and *J. W. Maxwell,* for respondent.

FOX, JUDGE:

This is a proceeding under Code, 13-1-25,26, to test the legality of a bond issue, in the sum of $150,000.00, claimed to have been authorized by the voters of Raleigh County, in a special election held on the 4th day of June, 1943. The case is presented to us on the petition of Herbert L. Sessler, a citizen and taxpayer of the said county, on behalf of himself and all other taxpayers of said county, asking us to reverse the ruling of the Acting Attorney General of the State, approving the legality of the bond issue aforesaid.

The special bond election in question was held under the provisions of Article 1 of Chapter 13 of the Code. The order of the county court calling the election was entered on the 4th day of May, 1943. The election was held on June 4, 1943, the result thereof, after a recount of the votes was had, was declared on June 16, 1943, and shortly thereafter the question of the approval of the issue was submitted, under the statute, to the Acting Attorney General, and the issue was approved by him on July 20, 1943. In the meantime, the petitioner herein, and in the same capacity, had instituted a suit in equity in the Circuit Court of Raleigh County, against the County Court of Raleigh County, a corporation, in which he attempted to contest said election, on the grounds of alleged fraud and irregularities in the conduct of the same, and for other reasons not definitely stated; and seeking an in-

junction against the county court from further proceeding with the said election, and from issuing the bonds claimed to have been authorized thereby. Information as to the pendency of this suit, in the form of a letter written by counsel, was communicated to the Acting Attorney General; but whether a copy of the bill filed therein was actually furnished him, in advance of his action, is not clear..

The petition before us sets up four grounds upon which we are asked to reverse the action of the Acting Attorney General in approving the bonds; first, that the statement contained in the order calling the special election with reference to the indebtedness of the county, bonded and otherwise, was false, and operated to mislead the voters; second, that the actual purpose of the issue was to acquire land and construct an airport and landing field thereon, and that Code, 13-1-6, required that the amount intended to be expended for each of the said purposes should have been set out in the order; third, that the order calling the special election was entered at the instance of the Chamber of Commerce of the City of Beckley, and other organizations, and was not so entered in compliance of the provisions of Code, 13-1-4; and fourth, that, in view of the pendency of the equity suit aforesaid, the Acting Attorney General should not have passed upon the legality of the bonds until questions raised in the said suit, with respect to the legality of the election, had been finally determined.

We consider the first ground mentioned as one of primary importance, and determinative of the main question we are called upon to decide. As stated above, the special election was called and held under the provisions of Article 1, Chapter 13, of the Code. The assessed value of all taxable property in Raleigh County for the then current year was $55,467,069.00, and the outstanding bonded indebtedness of the county, consisting entirely of district road bonds was, as of the date when the election was called, the sum of $780,500.00. Therefore, no question

arises as to the proposed new issue creating a bonded indebtedness in excess of that permitted under Section 8, Article 10 of the Constitution, or under Code, 13-1-3. Other provisions of Article 1, in relation to procedure and notice, seem to have been complied with, except in the particulars set out in the petition before us; and we will, therefore, confine our discussion to the alleged errors and omissions which, petitioner says, make the said bond issue illegal and void and which, he contends, required of the Acting Attorney General a ruling that the bonds so authorized to be issued were illegal and void, and their issue and sale disapproved.

Code, 13-1-4, requires that before a county court, as to a county bond issue, shall submit such a proposed issue to the voters, it shall by an order entered of record, set out certain information touching the purposes for which the bonds are to be used, the valuation of the taxable property of the county, and many other things. Sub-section (e) of Section 4 names "indebtedness, bonded or otherwise" as information necessary to be set out in the order. The county court by its order of May 4, 1943, pretended to comply with this particular requirement and incorporated therein the following statement: "(5) That the County of Raleigh and the County Court thereof have no indebtedness, bonded or otherwise except current obligations". It followed this statement with this: "That the district road bond issues in the various districts of the County are in the following amounts", and incorporated therein a table of the outstanding bonded indebtedness of the various road districts of the county, aggregating the sum of $780,-550.00. It was contended before the Acting Attorney General that the statement first above quoted was in fact false; that on July 1, 1942, there was an overdraft in the county fund of said county in the sum of $178,083.65, and this claim seems to be admitted by all parties in interest. After the bond election, and at a time when the Acting Attorney General's approval of the issue was being sought, to-wit, on July 6, 1943, the Clerk of the County Court of Raleigh

County filed with the Acting Attorney General a certificate in which he attempts to explain the misstatement of fact in relation to the overdraft in the county fund. In that certificate he says, in substance, that as shown by an audit to the State Tax Commissioner, there was such overdraft in the county fund as of July 1, 1942; that sinking funds had been accumulated for the purpose of retiring the district bonds aforesaid, as they matured, and that as of July 1, 1942, there was in the hands of the Sinking Fund Commission of the State of West Virginia the sum of $195,-329.42 and, as we understand his certificate, large sums of money, amounting to at least the amount of the county overdraft, in the hands of the Sheriff of the county, and belonging to the said sinking funds, which had not been turned over to the Sinking Fund Commission of the State; that these surpluses, and by that we assume was meant those in the hands of the Sheriff, were used from time to time in paying drafts issued by the county court drawn upon the general county fund; and he adds the statement that, had the surplus funds been paid on the district bonded indebtedness, that indebtedness would have been correspondingly reduced. He also states that, as of May 4, 1943, moneys were accumulated and available, to be replaced in said surpluses, belonging to said sinking funds, to the amount of approximately $100,000.00, and that as of May 4, 1943, the total surpluses in said sinking funds amounted to approximately $300,000.00.

On the basis of the statement contained in this certificate of the County Clerk, the ingenious argument is made that, inasmuch as all of these funds belong to Raleigh County, there was, in fact, no overdraft; that an overdraft must represent indebtedness; and that a county cannot be indebted to itself. We cannot agree with this contention. The money in the hands of the various sinking funds was the property of the magisterial districts issuing the bonds, for the retirement of which the sinking funds were created. When the county court appropriated these funds, and used them in paying drafts drawn on the county

fund, that fund owed the various magisterial districts the sums of money used by the Sheriff in paying these drafts, to the same extent as the county would have been indebted to the holders of the drafts had they not been paid. In any way we look at the matter we inevitably come to this conclusion. Indebtedness of a county, through an overdraft in its county fund, cannot be wiped out by any such legal legerdemain. Therefore, on May 4, 1943, the county court was indebted, on account of this overdraft, in the sum of $178,083.65, less any amount which may have been paid thereon; and the extreme limit of any such payment, according to the Clerk's certificate was $100,000.00. We call attention to the fact that it is not stated that this overdraft had been reduced by that sum, the certificate merely saying that "moneys were accumulated and available * * * to be replaced in said surpluses * * * to the amount of approximately $100,000.00."

That the overdraft in question was not a current expense, is too clear for argument. In the first place it was money spent in years prior to the fiscal year 1942-1943 and no part thereof expended in that year. In the second place, it was indebtedness illegally created, in violation of the provisions of Section 26, Chapter 67, Acts of the Legislature, Second Extraordinary Session, 1933, Michie 1943 Code, 11-8-26, which provides that "A local fiscal body shall not expend money or incur obligations: (1) In an unauthorized manner; (2) For an unauthorized purpose; (3) In excess of the amount allocated to the fund in the levy order; (4) In excess of the funds available for current expenses." Money illegally expended in one fiscal year may not be transformed into a current expense of a succeeding fiscal year.

We now have before us, as did the Acting Attorney General, the true facts. They are entirely different from those stated in the court order calling the special election. In that order it was stated that, aside from the $780,500.00 district road bonds, the county was not indebted except for current obligations. That statement was obviously untrue

for the reason that it is clear, from the statement of the State Tax Commissioner, and that of the County Clerk, that, as of July 1, 1942, the overdraft in the county fund was $178,083.65, which, in no aspect of the case could have been reduced below $78,083.65 at the date the election was called. In this connection, counsel for the respondents take the position that the record does not show that any part of the overdraft existed at the time the election was called, which the available revenues within the current fiscal year would not cover. We think the Clerk's certificate which is most favorable to the respondent, clearly indicates that at least $78,083.65 of the overdraft remained unpaid when the election was called, and, as stated above, we do not think the certificate of the Clerk shows an actual reduction of the overdraft at that time. We think it may be safely assumed that if this overdraft had been paid, as of the date the election was called, or could be paid out of current revenues, the Clerk's certificate would have so stated.

The incorrect statement as to the county indebtedness, contained in the county court's order calling the special election, cannot be defended in principle. The pertinent statute required that the voters of the county be correctly advised as to all existing indebtedness, bonded and otherwise, and we think this requirement is mandatory, and calls for the utmost good faith in its compliance, on the part of the county court. Mistakes can some times be overlooked; but, in this case, the officials of Raleigh County, having charge of its finances, had in their possession all the records necessary to disclose the actual indebtedness of the county, could have made a true and correct statement thereof, and failed to do so. No reasonable explanation is advanced why the existence of this large overdraft in the county fund was concealed from the voters; and no good reason is advanced why we should overlook such concealment, or say that, notwithstanding this glaring failure to state the true facts, what was done was a substantial compliance with the statute.

According to the papers considered by the Acting Attorney General, and now presented to us, the true status of the financial affairs of Raleigh County at the time the election was called was approximately this: The outstanding district road bonds aggregated the sum of $780,-500.00, and there had been collected in the districts, and paid into the sinking fund of the State, to be used for their retirement as they matured, the sum of $195,329.42. According to the Clerk's certificate of July 6, 1943, approximately $100,000.00 had been accumulated with which to replace in the sinking fund in the hands of the Sheriff, and the county fund owed the sinking fund the remainder of the overdraft which had been paid out of these surpluses amounting to at least $78,083.65; so that, apparently, the aggregate of the sinking funds in the hands of the Sinking Fund Commission of the State, and the Sheriff of Raleigh County, was approximately $373,413.07. Of course, this sum had not been applied on the bonded indebtedness, and that indebtedness was still outstanding; but that indebtedness did not loom so large, when the county had available funds out of which practically one-half thereof could be paid; and so, giving full credit as against the bonded indebtedness for the sinking funds, the districts would only have been required to collect $407,086.93 in taxes, in order to have a fund available sufficient to liquidate the bonds in full. If we add to this balance of bonded indebtedness, considering the accumulated sinking funds, the full amount of the overdraft in the county fund as of July 1, 1942, we have the sum of $585,170.58 as the total of the amount the county and districts would have to pay, as against the $780,500.00 of bonded indebtedness stated in the county court order calling the election; and of course the first mentioned sum would be reduced by whatever amount had been paid on the overdraft as of May 4, 1943. These figures are reached on the assumption, apparently followed by all parties to this controversy, that the aggregate of the outstanding bonds is $780,500.00, and that no account had been taken

of the sinking funds which had been accumulated for their payment.

This leads to the suggestion that, while the order of the county court calling the special election did not correctly state the financial status of the county, the truth is that, had that status been correctly presented, it would have appeared in a light more favorable to the county than that incorrectly stated in the court's order. If the total indebtedness of the county, including the whole of the overdraft as of July 1, 1942, and taking into consideration the available sinking funds, was only $585,107.58, that was a picture more favorable to the county than the statement made that the bonded indebtedness alone was $780,500.00. And if the overdraft had been reduced the picture would have been still brighter. If we assume that the voters were influenced, in casting their ballots on the bond issue proposal, by the amount of existing indebtedness, it may be contended that the smaller the existing indebtedness the more likely they were to vote to increase it. This raises a question of whether we can say that the misrepresentation, made in the county court's order, affected the result of the election, and was intended to, and did, operate in favor of the proposed bonds; and the further question of whether we shall permit the misconduct of county officials to thwart the will of the people in voting for these bonds, assuming, for the purposes of this case, that a sufficient number of such voters actually voted for the bonds. It may be plausibly contended that a true statement of the financial condition of Raleigh County would have tended to increase the number of votes cast in favor of the bond issue. But on the other hand a disclosure of the fact that the county court had permitted an overdraft in the county fund in a very large amount to accumulate might have had the effect to defeat the bonds. These are only matters of speculation.

But when everything is said that can be said in favor of the theory that the misrepresentation practiced by the county court, with respect to Raleigh County's indebted-

ness, did not in fact bring about a result different from that which would have been reached had the truth been told, we are still confronted with the fact that the requirements of Code, 13-1-4, were grossly violated. The creation of bonded indebtedness, many times running over a long period of years, —in this case was fifteen years, —imposing a present and future burden upon the people, is an important event. Our laws have wisely limited the amount of a debt which even the voters themselves may create, and it has laid down certain rules which must be complied with to legally create such indebtedness. One of these requirements is that people shall be informed of the amount of any existing indebtedness, when they are asked to create an additional one. That is a most vital matter. We think sound public policy, aside from the imperative terms of the statute, requires that it be considered a mandatory requirement of the first order. We cannot bring ourselves to believe that where it is clear that such requirement has not been complied with, as in the present case, a bond issue, based upon such a violation of law, should be allowed to stand. If it can be done in this case it can be done in every case. A decision to uphold the Acting Attorney General in this case would stand as a precedent for loose practices in the voting and issuance of bonds, in every county, school district and municipality in the State. It would have far reaching and prejudicial results as affecting the public interests. There are fifty-five counties, and the same number of school districts, in West Virginia, and many times that number of municipalities, and our laws provide that county courts, boards of education, and councils of municipalities, may submit to the people the question of issuing bonds. We take judicial notice of the fact that, in the past, these taxing units, and other like units, have issued bonds in large amounts and we may assume that they will do so in the future. When issued, they become a potential lien upon the property of every citizen residing within the taxing unit in which they are issued, and, if legally issued, the courts

will compel their payment. There should be, and there is, thrown around the creation of bonded indebtedness, every safeguard, to the end that the people be not misled, and that when asked to encumber their property, and to a certain extent their future, they be not induced to do so by any character of misrepresentation as to the status of their public affairs. In such a situation it is the high duty of every public official, having anything to do with the fiscal affairs of a county, school district or municipality, to scrupulously present the true facts to the public. That was not done in the case before us, and the failure to do so cannot be condoned. The true situation of the financial affairs of Raleigh County, while different from that stated by the county court in its order might, if it were an isolated case, afford some justification for holding that no public interest had suffered; on the other hand, the voters of Raleigh County are just as much entitled to have the law complied with, in a case affecting their interests, as are the people of the entire State to have the laws upheld; and the far reaching results and consequences of our permitting this bond issue to stand, are not the only considerations which lead us to hold that the bond issue in question must be invalidated, and the ruling of the Acting Attorney General reversed.

What we have said disposes of the main question, but, other questions being raised, they are entitled to consideration.

The second objection raised to the action of the Acting Attorney General is based upon the alleged failure of the county court to specify the amount of money proposed to be used for the different purposes which the court had in mind. The purpose the county court had in mind, as appears from its order calling the election was to "establish, acquire and construct an airport * * *"; and to submit to the voters the question of issuing bonds, the proceeds from the sale of which were to be used "for the acquisition and construction of said airport or landing field"; and "the purpose for which the proceeds of bonds hereinafter

described are to be expended are to acquire and construct an airport or landing field in and for Raleigh County, West Virginia, and in Shady Springs District thereof, at what is commonly known as the Penman site, which is located approximately one mile north of the junction of the Grandview and Penman County Roads leading to Beckley."

We think the language used refers to one project or purpose, and is not a case coming within the requirements of Code, 13-1-6, which provides in effect, that where a bond issue is to be used for more than one purpose, as is permitted, the order submitting the question to the voters shall contain a statement of the amount to be used for each of the purposes specified. We had this question before us in *State ex rel. Davenport* v. *Meadows*, 120 W. Va. 602, 199 S. E. 883, where we reversed the action of the Attorney General in approving a bond issue. In that case the City of Charleston was proposing (1) construction and extension of Kanawha Boulevard; (2) relocation and construction of streets in West Charleston; and (3) erection of fire department building, and the amounts allocated to the separate projects were not clearly specified. We do not think that the ruling in that case is authority for the contention set up by the petitioner herein, that the county court's order of submission was defective in failing to separate the different steps and expenses incident thereto, all necessary to the construction of a single project, namely, an airport and landing field.

The third objection to the Acting Attorney General's ruling is based on the contention that the action of the county court, in calling the bond election in question, was in some way due to the activity of the Chamber of Commerce of the City of Beckley and others, and some financial assurance against loss to the county court should a proposed bond issue be defeated. We do not approve the practice of public bodies accepting financial assurances in such circumstances, but, aside from this, if this organization, and others interested in the project, attempted,

in a proper way, to influence the county court in this matter such attempt should not be allowed to invalidate a bond issue voted by the people. A county court may, on its own initiative, submit the question of issuing bonds to the voters of a taxing unit over which it has control; and, where petitioned to do so by a stipulated percentage of the legal voters, is required to do so. Code, 13-1-4. That a commercial or civic organization may interest itself in advocating public improvements, should not be permitted to detract from the merits of the project, or affect the legality of any action of public officials influenced thereby, unless such influence is exerted in an improper way, and in such circumstances as can be said to amount to an improper control of the acts of such officials.

The fourth point of objection relates to the pending suit in equity seeking to contest the election, and to enjoin the issuance and sale of the bonds. In view of our holding, the questions involved in that suit would appear to be moot. Therefore, we do not deem it necessary to discuss this feature of the case except to say this: Even if we were to hold, that, on the papers presented to the Acting Attorney General, his action in sustaining the bonds should be upheld, such action on our part would not be permitted to have the effect of ousting the Circuit Court of Raleigh County of its jurisdiction to finally hear and determine the matter set up in the pending litigation. The provisions of Code, 13-1-25, under which the Acting Attorney General acted, and Section 26 of the same article, under which we are asked to act, contemplate that when an Attorney General has ruled his action may be reviewed by this Court. And Section 27 provides that if application for review is not made before this Court, within ten days from and after the date of the last publication of the notice of the Attorney General of his action approving or disapproving the validity of the issue, "the bond issue approved by him shall become incontestible and shall be valid and binding obligation upon the taxable property within the political division which

authorized the bond issue by the vote of the people therein; and no one shall thereafter have a right to contest in any court or in any action or proceeding the legality of any election held under this article, the bond issue provided for or the tax required to pay the same, for any cause whatsoever." We do not think these provisions can possibly mean that, where prior to the approval of a bond issue by the Attorney General, a citizen and taxpayer has instituted his suit or action attacking the legality of the election, the jurisdiction of the court to hear and determine such suit or action 'can be ousted, or in any manner affected, by any proceeding on the part of the Attorney General, under the statutes cited. To do so would be to permit the Attorney General to pass upon and finally determine, subject only to reversal by this Court, questions which had already been submitted to a court of competent jurisdiction, and to oust that court of its jurisdiction. If, in such a case, and notwithstanding the pending suit or action, the Attorney General approved the issue, such approval would, necessarily, be subject to any order or decree which might be entered in the pending litigation.

We are of the opinion that the issue of bonds in question is invalid, and the ruling of the Acting Attorney General is therefore reversed.

*Ruling of Acting Attorney General reversed.*

Lovins, Judge, dissenting:

I would deny the prayer of the petition and hold the bond issue valid.

The majority opinion holds the bond issue invalid on the sole ground that the statement of the existing overdraft in the county fund was not made and published in the order calling the election. The statutory provision requiring a statement of the indebtedness of the political subdivision to be set forth in the order calling a special election to authorize a bond issue is mandatory. *McGuire v. City of Philadelphia*, 245 Pa. 307, 91 A. 628. It has been

held where the statute does not require a statement of indebtedness that even a misleading statement relative thereto will be regarded as surplusage, and that a bond issue is valid in the absence of a showing that such misstatement affected the result of the election approving the bonds. *Anselmi* v. *City of Rock Springs,* 53 Wyo. 223, 80 P. 2d 419. See also *Commonwealth Public Service Co.* v. *City of Deer Lodge,* 96 Mont. 48, 29 P. 2d 667. In this jurisdiction, however, the statute requires a statement of indebtedness, bonded or otherwise, to be made in the order submitting the bond issue to a vote. Code, 13-1-4 (e). But a substantial compliance with the statute is sufficient. *State* v. *England,* 86 W. Va. 508, 514, 103 S. E. 400. The purpose of the statutory provision requiring statement and publication of indebtedness is to give to the voters of a political subdivision sufficient facts that they may prudently cast their ballots for or against a proposed bond issue.

The order as published by the County Court of Raleigh County stated that the bonded indebtedness was $780,500, being the aggregate amount of bonds issued on behalf of the magisterial districts of the county. A magisterial district is not a legal or corporate entity, and, being merely a territorial division for the election of certain officers, bonded indebtedness incurred in the name of such district is a debt of the county in which it is located. *Neale* v. *County Court,* 43 W. Va. 90, 27 S. E. 370; *Hickenboatam* v. *County Court,* 95 W. Va. 253, 258, 120 S. E. 767; *Sanders* v. *County Court,* 115 W. Va. 187, 174 S. E. 878. The magisterial districts of Raleigh County do not owe the bonded indebtedness and have no ownership of the money derived from taxes assessed and collected to pay the same. It may be that the taxpayers of the various magisterial districts of Raleigh County are entitled to have such taxes applied to the payment of the bond issues on behalf of their respective districts, but that question does not arise here.

For the purpose of determining whether the constitutional limitation of indebtedness will be exceeded, assets

devoted to payment of outstanding bonded indebtedness and in the hands of the proper officer, board or fiscal body may, within certain limitations, be deducted from the amount of outstanding bonded indebtedness. *Brook* v. *Philadelphia,* 162 Pa. 123, 29 A. 387; *Kansas City Southern Ry. Co.* v. *Board of Education,* 158 Okla. 274, 13 P. 2d 115. Although the question here does not involve exceeding the constitutional limitation of indebtedness, the same principle may be applied to the process of determining the amount of net indebtedness of a political subdivision for the purpose of statement in an order authorizing an additional bond issue. Deducting money applicable to payment of the bond issue, the County Court of Raleigh County overstated the bonded indebtedness to the amount of $373,413.07, and made no statement of the existing overdraft in the county fund amounting to $178,083.65. This action on the part of the County Court of Raleigh County is inexcusable from the standpoint of morals and proper governmental policy. However, when the action of the county court is measured by the rule of substantial compliance and the purpose for which the statement is made and published, hereinabove mentioned, it is difficult to see wherein the omission of the statement of the overdraft either affected the result of the election or was prejudicial to the public interest. Voters in passing on the issuance of new bonds and incurring an increased debt would naturally be interested in the total amount of the debt rather than any particular item or classification thereof. In this instance the county court overstated the aggregate amount of all the county indebtedness to the extent of $195,329.42. This action of the county court, it seems, would tend to cause the voters to cast their ballots against the bond issue. Nevertheless, the voters of Raleigh County approved the bond issue by a sufficient majority, and, so far as shown by the record here, there is neither fraud nor conduct which would vitiate their ballots.

It seems to me that the holding of the majority when fully analyzed nullifies an election for the failure of the

county court to segregate its bonded indebtedness from its overdraft indebtedness and correctly itemize the same in its order calling the special election, and that the rule of substantial compliance with the statute was overlooked. "It is a canon of election law that an election is not to be set aside for a mere informality or irregularity which cannot be said in any manner to have affected the result of the election. Courts are anxious rather to sustain than to deny the popular will." Dillon on Municipal Corporations, 5th Ed. Section 374. See McQuillin Municipal Corporations, Second Ed. Sections 430 and 2361.

The objections to the bond issue do not go to the constitutional and statutory power of the County Court of Raleigh County to issue the bonds, but only to the manner in which that power was exercised. It is in conflict with the weight of authority to invalidate a bond issue after a special election has been held authorizing the same, where the action of a fiscal body is within its power and jurisdiction and substantially complies with the statute. In this case the invalidity of the bond issue is grounded on a technical failure to comply with the letter of the legislative enactment.

For the reasons above mentioned, I respectfully dissent.