STATE OF MISSOURI at the relation of JACKSON COUNTY, DAVID E. LONG, J. W. HOSTETTER and BATTLE McCARDLE, as Judges of the County Court of Jackson County, and WILLIAM HICKS, as Clerk of the County Court of Jackson County, Petitioners, v. MARION D. WALTNER, Judge of the Circuit Court of Jackson County and CLARENCE B. REED.—100 S. W. (2d) 272.

Court en Banc, December 22, 1936.

*Jno. B. Pew, Rufus Burrus* and *Robert B. Fizzell* for petitioners.

138

*Proctor & Proctor* for respondents.

ELLISON, C. J.—Original proceeding in prohibition. The relators, Jackson County and the judges and clerk of the county court thereof, seek to prohibit the respondent, Hon. Marion D. Waltner, judge of the Jackson County Circuit Court at Independence, from entertaining jurisdiction of a suit in equity there pending, wherein the respondent Clarence B. Reed prays a permanent injunction restraining the relators from executing, issuing and selling $2,761,300 in county bonds authorized at a special bond election held on August 4, 1936, which was also the date of the State primary election. Two proposals were submitted at the election: one for the issuance of $2,465,000 in bonds for the purpose of paying and funding judgment indebtedness of the county, and one for the issuance of $296,300 in bonds for the purpose of refunding outstanding judgment bonds.

In due course our provisional rule in prohibition was issued and the respondents made return thereto, admitting all necessary formal steps were taken for the holding of the special bond election, and that on the face of the returns therefrom more than two-thirds of the qualified voters of the county approved the two bond proposals. But they affirmatively allege the petition of the respondent Reed in the equity suit below states a good cause of action, and that the allegations of fact therein are true; that the respondent Waltner is lawfully possessed of the cause and has inherent power in equity to determine the same; that the jurisdiction of the Circuit Court of Jackson County over the cause is derived from the common law and provisions of the State Constitution; that said equity suit is not a proceeding to contest the bond election, except incidentally, but is for the purpose of protecting the property of the respondent Reed, and other taxpayers similarly situated, against the burdens which would be imposed thereon by the issuance of said bonds. The relators

filed a motion for judgment on the record praying that our provisional rule in prohibition be made absolute. The case therefore turns solely on questions of law raised by the return of the respondents, and the petition of the respondent Reed.

Reed's petition for injunction covers about nineteen pages of the printed record. It starts with a general charge "that there existed at the time of the submission of said proposals a wicked and illegal collusion and conspiracy by and between T. J. Pendergast, who dominates and controls the political machine which bears his name, and certain of the election officials, to certify, after the election, that the proposals had carried, regardless of the number of votes which might be cast against them."

It is then alleged that as a part of said conspiracy the bond election was held on August 4, 1936, the day of the State primary election, because it was known many voters opposed to the bonds would be absent from Jackson County at that time; and because said political organization planned to count, cast and certify as many votes, legal and illegal, as it could muster for its candidates for nomination in the primary election, and to certify the same votes for the bonds; that a large number of the judges and clerks of the election had a personal financial interest in the issuance of the bonds because the county was indebted to them in the sum of $138,000 for like services in a former election, which indebtedness was to be discharged out of the new bond issue; that more than half of said election judges and clerks were not appointed as contemplated by law, but were selected through the influence of said Pendergast organization and were in collusion with it.

Next the petition charges the election was not free and open, as required by the State Constitution, but that in each precinct of each ward in Kansas City except a few scattered precincts in the Fifth, Sixth, Seventh, Eighth, Fifteenth and Sixteenth wards, the same was attended by oppression, intimidation, coercion, brutalities, false counts and false certification; that the election in a majority of precincts was tainted, saturated and vitiated by fraud; that the entire vote in the First, Second, Third, Fourth, Ninth, Tenth, Eleventh and Twelfth wards was so permeated with fraud on the bond proposals that it should be thrown out and disregarded; and that less than two-thirds of the qualified voters of the county voting at the election voted for the bonds.

On ten pages of the printed petition are set out tables showing the vote on the bond election with the number of registered voters in 142 voting precincts in Kansas City wherein there was an aggregate vote for the bonds of 75,609, against the bonds of 1230, and an aggregate registration of 96,954. It is alleged that the vote in twenty-one of these precincts was greater than the total registration therein; and that in sixty-five precincts there were no votes against the bonds

and 34,484 votes for the bonds; that in one precinct where 1144 votes were certified for the bonds not to exceed seventy-five persons entered the polling place at the election to vote thereon; and that in another precinct where 397 votes were certified for the bonds there were not to exceed fifty qualified resident voters.

The petition then sets out the vote in twenty-one precincts of four rural townships of Jackson County wherein the aggregate vote for the bonds was 2100 and 1224 against them, which was a little over sixty-three per cent in favor of the bonds; and says this vote reflected the true sentiment of the qualified voters of the county in relation to the bond proposals.

It is further alleged that the regisration list in Kansas City on the date of the election contained the names of 100,000 persons who were not qualified voters, and that practically all of these were certified as having voted for the bond proposals; that at least 20,000 votes cast against the bond proposals were certified as having been cast therefor; that the population of Kansas City has not increased in recent years, but has decreased since 1932; that there were not to exceed 600 qualified voters residing in the second ward on the date of the election, and in the first ward not more than 10,000 qualified resident voters, but that the total vote certified for the bonds from these two wards was more than 40,000.

It is further alleged that in divers precincts throughout the city numerous judges and clerks were driven from the polling places because of their known reputation as law-abiding citizens; and in a certain precinct of the Twelfth ward the judges and clerks of the election secreted and carried away the ballot boxes more than one hour before the close of the voting day, for the purpose of evading detection in the illegal manner in which the election had there been conducted throughout the day.

Finally, it is alleged "that the ballot boxes, the registry lists, poll books and other records in the office of the Election Commissioners of Kansas City, Missouri, will establish the truth of the allegations contained herein."

██ We have endeavored to state the full substance of the petition in the suit below in order to show the nature of the claim made by respondent Reed. There is only one real question in the case, and that is whether he can by his injunction suit in the Jackson County Circuit Court contest the vote in the bond election. That question has been ruled contrary to respondents' contention so many times in this State that it hardly calls for discussion.

There is one case, Robinson v. Wiese, 210 S. W. 889, 894, decided by Division One of this court in 1919, in which one judge concurred and three judges concurred in the result, wherein it was held that a court of equity has general jurisdiction to grant relief from the issuance of school bonds on the ground of fraud in the count of the

ballots at the election authorizing the same, when private property rights are involved—though such relief was denied in the particular case. But the next year, 1920, the court en banc held the other way in State ex rel. Wahl v. Speer, 284 Mo. 45, 54, 223 S. W. 655, 657; and that decision has since been followed in State ex rel. Ray County v. Hackman (banc, 1922), 295 Mo. 417, 424, 245 S. W. 545, 555; Wilson v. Washington County (Mo. Div. 2, 1922), 247 S. W. 185, 187; Boney v. Sims (Div. 1, 1924), 304 Mo. 369, 376, 263 S. W. 412, 414; Long v. Consolidated School Dist. (Div. 1, 1932), 331 Mo. 302, 53 S. W. (2d) 867; State ex rel. City of Clarence v. Drain (banc, 1934), 335 Mo. 741, 746, 73 S. W. (2d) 804, 806.

In the Speer case the opinion, by Judge Goode, devotes nearly six pages to a discussion of the question and cites many decisions pro and con from other jurisdictions. The fact is pointed out that there is an exception to the general rule giving equity jurisdiction to grant relief in all cases of fraud the exception being "in political affairs which have always been held to lie outside the sphere of equity." The case holds "the Legislature never has intended there should be a judicial inquiry concerning the legality of the voting in a county bond election," or another kind of election except where a statute authorizes it; and that "the right of citizens and taxpayers to honest elections is meant to be protected by the judges who supervise the voting at the polls." If it were otherwise, protracted litigation in courts of equity contesting bond elections might greatly delay and sometimes even defeat State, county and municipal financing. The law affords other means of uncovering fraud in elections.

The holding in the Speer case is not *obiter dictum*, as respondents contend. There *mandamus* was brought to compel county judges to issue bonds voted for the building of a courthouse. They defended on the ground, among others, that there was pending against them a suit to enjoin the issuance of the bonds because fraudulent votes entered into the result. It was in the consideration of this defense that the question was discussed at length and decided in the Speer case. And the contrary statements in Robinson v. Wiese, supra, were overruled a few years later in Boney v. Sims, supra, 304 Mo. l. c. 380, 263 S. W. l. c. 415.

Learned counsel for respondents in the oral argument here acknowledged the force of these decisions and conceded a taxpayer cannot go into a court of equity and obtain a recount of the ballots in a bond election. But he contended, as he does in his brief, that the election here involved should be overturned on a showing that it carried out a conspiracy and was permeated with fraud—without any count of the ballots—just as if the fact were made to appear that it was held without notice, or on the wrong day, or at the wrong place. We cannot agree to that. The gist of the respondents' contention is that on a fair count of the ballots the bonds did not carry. Near the

close of his equity petition the respondent Reed alleged "that the ballot boxes, the registry lists, poll books and other records in the office of the Election Commissioners of Kansas City, Missouri, will establish the truth of the allegations contained herein."

In their printed argument here respondents say the ultimate fact that the bond issues in controversy were not assented to by two-thirds of the qualified voters may be proven "through evidence offered by election officials themselves to the effect that either there was a flagrant mistake in the canvassing and certifying of the total vote or in the alleged fraud which surrounded and permeated the bond election." The thought is that the election could be invalidated on this general proof without any recount of the ballots. But the inadequacy of such procedure (aside from the legal phases of the question) is made evident by the statement in the respondent Reed's equity petition that the vote in the four rural townships shown, where the bonds carried by a little over sixty-three per cent, reflected the true sentiment of the whole county. This lacked less than four per cent of bringing the vote to the required two-thirds. On a vote that close it would obviously be unfair to overturn the result on the general testimony of election officials as to mistakes or fraud in canvassing and certifying the vote, without consulting the best evidence, the ballots and records. Relators in their brief say, and it is not disputed, that one bond issue carried 152,090 to 14,380, and the other, 152,866 to 14,675. Neither should the bonds be invalidated because propaganda and organized efforts were made to procure votes for them. [State ex rel. Russell v. State Highway Comm., 328 Mo. 942, 961, 42 S. W. (2d) 196, 202.]

█ Finally, in avoidance of the ruling in our cases that the right to contest an election is neither a common-law right nor an equitable right, but is purely statutory, respondents strenuously urge that certain Missouri statutes authorize a court of equity to grant relief, such as is sought in respondent Reed's petition for injunction below, against a public bond issue purportedly authorized by a fraudulent vote or count of the ballots. Respondents first cite Section 12, Article X of the Constitution forbidding any county, etc., "to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof voting on such proposition, at an election to be held for that purpose;" and to Section 10, Article II of the Constitution which provides "the courts of justice shall be open to every person, and certain remedy afforded for every injury to person, property or character, and that right and justice should be administered without sale, denial or delay."

The respondents cite Sections 2915, 2920, 2922, 2926, 2927 and 2928, Revised Statutes 1929 (Mo. Stat. Ann., pp. 760, 762, 765 and 768). Section 2915 requires bonds issued for any purpose by any

county, etc., to be presented to the State Auditor for registration and certification but provides that such certification shall not prevent any person from proving all the conditions of law were not complied with in their issuance, or challenging the power of the county court to issue the same. Section 2920 contains further provisions about the registration of bonds by the State Auditor. But regardless of everything else, it need only be said that these sections are not applicable to bonds issued by any county having a population of over 300,000 inhabitants as established by the last United States census, and therefore do not apply to the bonds here involved issued by Jackson County. [Sec. 2919, R. S. 1929, Mo. Stat. Ann., p. 762.]

Section 2922 authorizes counties to submit to vote at a special election a proposition to issue funding bonds which must receive the assent of two-thirds or more of the qualified voters voting on the proposition. Section 2926 provides that wherever and whenever any county, etc., shall have issued bonds under and by authority of any provision of the Constitution of the State of Missouri or any law enacted in pursuance thereof, such county may file in the circuit court having jurisdiction of the subject matter a petition for a *pro forma* decree authorizing the issuance of such bonds. Section 2927 provides for the publication of notice of such proceeding and permits any taxpaying citizen to file an intervening petition contesting the validity of such bonds. Section 2928 provides that upon a hearing, the court shall carefully investigate the record concerning such bond issue, together with all evidence and proofs submitted at such hearing, and if the court be of the opinion that said bonds are legal and that bonds are legal and that the laws of the State have been complied with, then such court shall make an order and decree adjudging such bonds to be valid.

We need not discuss these sections at length. None of them authorize a proceeding contesting the result of a bond election. All the Missouri cases cited at the beginning of this discussion were decided after the enactment of these statutes, and the two constitutional provisions cited have been in force substantially as they are now, on the point here involved, since 1875. It has never been held—unless the opinion in the Wiese case be considered in point—nor has it been the understanding of the bench and bar of this State, that the financing arrangements of counties, cities, villages, school districts, townships, road, levee and drainage districts can be interrupted by proceedings in equity enjoining the issuance of bonds upon a challenge of the vote by which they were authorized. The statutes invoked refer only to the regularity of the proceedings underlying the bonds, and to the constitutional limitations upon such indebtedness.

It may be thought that since the relators by filing their motion for judgment on the record, have admitted the truth of the facts well pleaded in respondents' return and in Reed's injunction peti-

tion in the circuit court, and since the return and petition allege the bonds did not receive a two-thirds majority vote in the election, therefore the way is opened for the respondent Waltner to enjoin the issuance of the bonds. But such is not the law. Relator's motion for judgment on the record only admits *for the purposes of our writ* the facts pleaded by respondents. It does not admit those facts are actually true. The question before us concerns the *jurisdiction* of the circuit court, not the truth or falsity of the facts alleged. There being no common law, equitable or statutory authority for the bringing of a bond election contest, the circuit court has no jurisdiction of the proceeding, and can no more grant an injunction therein on facts not disputed than it could after a determination of disputed facts.

Without going into the matter further it is evident that the petition for injunction of the respondent Reed in the circuit court of the respondent Waltner in Jackson County states no substantive cause of action, and cannot be made to state one in the present state of our legislation on the subject. It is therefore ordered and adjudged that our provisional rule in prohibition heretofore issued, prohibiting respondent Waltner from entertaining and hearing said suit be made absolute. All concur, except *Frank, J.*, who dissents.