THOMAS H. SYKES, ALBERT T. PEARSON AND JIMMY W. PATTON, AS REPRESENTATIVES OF CITIZENS OF CHARLOTTE, NORTH CARO-LINA WHO OPPOSE APPROPRIATION OF THE PROCEEDS OF DECEMBER 12, 1969 BOND REFERENDUM IN OTHER THAN MANNER AUTHORIZED BY THE VOTERS v. JOHN M. BELK, MAYOR OF CHARLOTTE, NORTH CAROLINA AND FRED ALEX-ANDER, JOE D. WITHROW, JERRY TUTTLE, MILTON SHORT, JIM WHITTINGTON, S. R. JORDAN AND JOHN THROWER, MEMBERS OF CHARLOTTE CITY COUNCIL

No. 52

(Filed 10 March 1971)

1. Taxation § 6— bond issue for municipal auditorium — necessity for vote

The construction, acquisition and operation of an auditorium by a municipality is not a necessary expense, and the voters of the munici-pality must therefore approve a bond issue for such purpose. N. C. Constitution, Art. VII, § 6.

2. Estoppel § 5; Municipal Corporations § 5— estoppel against munici-pality — governmental functions

The doctrine of estoppel generally will not be applied against a municipality in its governmental, public or sovereign capacity.

3. Municipal Corporations § 5— operation of civic center —choice of site — proprietary and governmental functions

While the operation of a civic center is a proprietary function, the choice of the site for the center by the city council is a public or governmental function.

4. Estoppel § 4— prejudicial misleading

An estoppel involves a prejudicial misleading.

5. Elections § 8; Municipal Corporations § 39— municipal bond election — presumption of validity

Every reasonable presumption will be indulged in favor of the validity of municipal bond elections, and the courts will uphold their validity unless clear grounds are shown for invalidating them.

6. Municipal Corporations § 4; Public Officers § 8— exercise of discre-tionary powers — judicial review

The courts will not interfere with the exercise of discretionary powers of a municipal corporation unless its actions are so unreason-able and arbitrary as to amount to an abuse of discretion.

7. Elections § 10; Municipal Corporations § 39— civic center bond elec-tion — campaign misrepresentations as to site of center

Misrepresentations as to the site of a proposed municipal civic center made in public speeches and through the news media by the mayor, other city officials and members of a Citizens Bond Information Committee appointed by the mayor did not vitiate a special election in which voters approved the issuance of bonds for the civic center,

Sykes v. Belk

where (1) the purpose for the bond issue was to revitalize the downtown area, with the civic center becoming a catalyst for other projects, and the site finally chosen by the city council was only four blocks from that advertised in the bond election campaign, there being no substantial deviation from the purpose for which the bonds were proposed, and (2) the record does not show and the facts do not require the appellate court to infer that enough voters relied on the misrepresentations to change the election result.

**8. Jury § 1— civil action — right to jury trial**

Every person has the right to demand a jury trial of issues of fact arising in all controversies at law respecting property. N. C. Constitution, Art. I, § 19.

**9. Jury § 1; Rules of Civil Procedure § 38; Trial § 56— civil action — waiver of jury trial**

A party may waive his right to a jury trial (1) by failing to appear at the trial, (2) by written consent filed with the clerk, (3) by oral consent entered in the minutes of the court, or (4) by failing to demand a jury trial pursuant to G.S. 1A-1, Rule 38(b). N. C. Constitution, Art. IV, § 12.

**10. Jury § 1; Trial § 56— denial of motion for jury trial — waiver of jury trial — stipulations and judicial admissions**

The trial court did not err in the denial of plaintiffs' motion for a jury trial where stipulations filed in the cause with the clerk show that the parties waived a jury trial, and the parties had stipulated and judicially admitted facts sufficient to support a judgment determining their rights under the applicable law at the time the trial court denied the motion for a jury trial and entered final judgment.

**11. Pleadings § 32; Rules of Civil Procedure § 15— denial of motion to amend complaint — lack of prejudice**

Plaintiffs were not prejudiced by the court's refusal to allow an amendment to the complaint relating to their right to bring the action, where the judgment was not based on plaintiffs' standing to sue and defendants abandoned any contention that plaintiffs lacked standing to sue.

**12. Appeal and Error § 28; Trial § 58— failure to find immaterial facts**

The trial court did not err in refusing to make further findings of fact which are immaterial and which would not call for a different conclusion.

APPEAL by plaintiffs from *Bryson, J.,* at 27 August 1970 Session of MECKLENBURG Superior Court. This case was docketed and argued as Case No. 82 at the Fall Term 1970.

This is a civil action seeking injunctive relief. The record reveals these pertinent facts:

Sykes v. Belk

On 17 December 1966 a special bond election was held in the City of Charlotte, North Carolina. The ballot presented six questions concerning issuance of bonds for various municipal projects. Question No. 2 on the ballot was whether the City could issue bonds not exceeding $2,500,000 for the acquisition of land by the City for the construction of public facilities, including the acquisition of land from the Redevelopment Commission of Charlotte. Pre-election campaigns gave the voters detailed information with regard to plans for a civic center, including press releases and public statements that the center would be located at the corner of College and Trade Streets, known as the "Trade Street" site. Neither the ballot, ordinance, nor any official action mentioned the location of the civic center. The voters rejected this proposition.

On 14 October 1969 the Charlotte City Council, after passing resolutions for the submission of nine bond issues to the voters of Charlotte, passed a resolution which provided that the questions would be submitted at a special bond election to be held on Friday, 12 December 1969. Item No. I on the ballot read as follows:

1. Shall an ordinance passed on October 13, 1969, authorizing the City of Charlotte, North Carolina, to contract a debt, in addition to any and all other debt which said City may now or hereafter have power or authority to contract, and in evidence thereof to issue

YES ( )                     PUBLIC BUILDING BONDS

in an aggregate principal amount not exceeding $10,700,000 for the purpose of providing funds with any other available funds, for constructing a

NO ( )      building or buildings to be used as a civic center, including, but without limitation, convention, exhibition, auditorium, meeting room, parking and other appurtenant facilities, and the acquisition of necessary land and rights of way, and authorizing the levy and collection of a sufficient tax for the payment of the principal of and the interest on said bonds, be approved?

We quote the ordinance which authorized the debt for a civic center, subject to the approval of the voters:

BE IT ORDAINED by the City Council of the City of Charlotte:

Section 1. That, pursuant to The Municipal Finance Act, 1921, as amended, the City of Charlotte, North Carolina, is hereby authorized to contract a debt, in addition to any and all other debt which said City may now or hereafter have power or authority to contract, and in evidence thereof to issue Public Building Bonds in an aggregate principal amount not exceeding $10,700,000 for the purpose of providing funds, with any other available funds, for constructing a building or buildings to be used as a civic center, including, but without limitation, convention, exhibition, auditorium, meeting room, parking and other appurtenance facilities, and the acquisition of necessary land and rights of way.

Sec. 2. That a tax sufficient to pay the principal of and the interest on said bonds shall be annually levied and collected.

Sec. 3. That a statement of the debt of the City has been filed with the clerk and is open to public inspection.

Sec. 4. That this ordinance shall take effect when approved by the voters of the City at an election as provided in said Act.

Included in the nine questions submitted to the voters was the question whether bonds should be issued in an amount not to exceed $5,025,000 to provide for widening and extending, constructing or reconstructing street surfaces. Another of the questions presented was whether the voters would approve the issuance of $1,250,000 in bonds for acquisition of land for streets and highways.

Shortly after the bond election was called, Mayor John M. Belk made a public speech, which was carried in the news media, in which he announced the appointment of George H. Broadrick as Chairman of the Citizens Bond Information Committee. In this speech the Mayor pledged that the Committee would be given complete and factual information. The press releases of this Committee and the information furnished to the Committee are voluminous. The information relative to the civic center, in brief summary, shows that the civic center was pro-

jected to be the focal point for a far-reaching redevelopment of the Charlotte downtown area. Among other things, the civic center was pictured as making Charlotte a major convention city. Information was given to the voters that private investors were ready to invest between 54 and 66 million dollars in the downtown area, contingent on the erection of the civic center. It was contended that the private investment would revitalize the downtown area and would increase the property tax base by an estimated $529,000 annually. The information released through the news media and in public speeches placed the site of the civic center on the northwest corner of the intersection of Brevard and Second Streets, called the "Brevard Street" site. The plans for the center showed a ground floor capacity of at least 170,000 square feet and a parking lot providing space for 1200 cars, which purportedly would generate $40,000 annual income. In connection with the erection of the civic center, information was given that street improvements were to be made in the immediate area of the Brevard Street site to accommodate traffic generated by the civic center.

The record shows that no one was ever given specific information that the Charlotte City Council had formally and officially selected the site upon which the civic center would be built. Neither the ballot, the ordinance, nor any other officially adopted document, mentioned the site of the civic center. There was no official action on the part of the City Council concerning the site of the civic center prior to the election.

On 12 December 1969, the voters approved all nine of the proposals submitted. In January 1970 a committee was selected by the Charlotte City Council to implement the building of the civic center, and on 1 April 1970 the City sold bonds in the amount of two million dollars for the building of the civic center. On 10 April 1970 the committee selected to implement the building of the civic center reported that the "Brevard Street" site was not suitable because to build on that site would necessitate the blocking off of a major traffic artery, or the erection of a civic center 30 feet above ground level on stilts, so as to allow traffic to pass underneath. The committee's findings were that this added expense would make the building cost exceed the amount authorized in the bond referendum. The committee thereupon recommended that the civic center be placed at the "Trade Street" site, the same site which had

Sykes v. Belk

been unofficially suggested when the bond referendum was rejected in 1966. The two sites are approximately four blocks apart. On 13 April 1970 the City Council, after hearing strenuous objections to the change in location of the civic center, approved the recommendation that the center be located at the "Trade Street" site.

On 26 May 1970 plaintiffs filed suit seeking to enjoin the expenditure of funds on a civic center which would be located at the "Trade Street" site. Plaintiffs contend primarily that "the taxpayers of Charlotte, North Carolina, did not give a blanket approval to the city administration to spend 10.7 million dollars for a civic center, but that the voters and taxpayers of Charlotte, North Carolina, gave authority to the city administration to sell bonds within the limits specified in the bond referendum with the funds so raised to be used in the express manner and for the express purposes [for which] the city administration represented these funds would be used . . . . " The allegations in the complaint candidly state that "[T]here is no allegation and no implication in this Complaint that any of the defendants herein named acted maliciously or that any defendant herein named had a deliberate intention to mislead the voters of Charlotte, North Carolina in a predetermined intention to change the plans for the expenditure of funds thereby raised subsequent to the approval of said expenditure."

On 27 May 1970 Judge Bryson entered an order directing defendants to appear before the Judge Presiding over the non-jury term of Mecklenburg County Superior Court on 10 June 1970 to show cause why they should not be enjoined from continuing with the construction of the civic center on Trade Street. On 10 June 1970 the parties appeared before Judge Bryson and submitted documentary evidence, and the determination of this question was continued until entry of final judgment. On 15 June the parties stipulated that the trial court could consider the questions before it out of term and out of district, and that the court might receive and consider other documentary evidence which counsel might submit; provided, that the admissibility into evidence of such documents was not stipulated by either party.

On 23 June 1970 defendants filed their answer.

On 30 June 1970 plaintiffs filed a written demand for a jury trial.

On 27 August 1970 Judge Bryson entered an order denying plaintiffs' demand for a jury trial on the ground that there was no question of fact presented for determination. On the same date, final judgment was filed by Judge Bryson. Since the findings of fact restate many of the facts stated above, we now set forth only those Findings of Fact and Conclusions of Law which we consider crucial to decision, to wit:

### FINDINGS OF FACT

2. . . . No site location was specified in the official advertisements informing the public that this election would be held on December 12, 1969.

3.          Prior to December 12, 1969, newspaper articles appeared stating that the Civic Center would be built on the "Brevard Street Site," an area bounded by College, Brevard, Second and Third Streets. This same information as to the site location was given by individuals in speeches favoring the bond issue, and statements were issued by City officials speaking in favor of the bond issue.

4. . . . There was no site location specified in the question presented to the voters on the ballot.

5.          On April 13, 1970, the Charlotte City Council, meeting in regular session, approved by motion, the construction of the Civic Center on what is now known as the "Trade Street Site." . . .

6.          At no time did the Charlotte City Council act officially in selecting any site other than the Trade Street site, and at no time have the Charlotte voters voted on a specified site for the construction of a Civic Center.

### CONCLUSIONS OF LAW

2.          A city's governing body has the power to exercise discretion and judgment, and to choose between alternative courses of action so long as these officials act in good faith and in accordance with the law and without arbitrariness. Its decision should not be overturned by the Court.

3.        The Charlotte City Council exercised discretion in the selection of a site for the Civic Center, and its decision is based upon facts. The Court will not substitute its judgment for that of the city's duly elected governing body for the reasons given above.

Judge Bryson thereupon dismissed the action and denied plaintiffs' motion for a restraining order. On 28 August 1970 plaintiffs moved to be allowed to amend their complaint, which motion was denied on the same day, and plaintiffs excepted.

Plaintiffs appealed to the North Carolina Court of Appeals. This case is before this Court pursuant to our general referral order effective 1 August 1970.

*Gene H. Kendall for plaintiffs.*

*Henry W. Underhill, Jr., and W. A. Watts for defendants.*

BRANCH, Justice.

Plaintiffs' principal contention is that on 12 December 1970 the voters of the City of Charlotte did not approve the issuance of bonds for a civic center at any place other than the "Brevard Street" site, because the bond issue was approved on the basis of misleading representations made in public speeches and through the news media by certain defendants and others (including the "Citizens Bond Information Committee" appointed by the Mayor) that the civic center would be located on the "Brevard Street" site.

Plaintiffs do not attack the election for failure to meet procedural requirements; neither do they contend that the ordinance, the notice of election, the ballot, or any formal action of the City Council invalidated the election.

This case presents a question of first impression as to whether misrepresentations made during a campaign for a special election vitiate the election.

Art. VII, § 6, of the North Carolina Constitution provides:

"No county, city, town, or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same except for the necessary expenses thereof, unless

approved by a majority of those who shall vote thereon in any election held for such purpose."

[1]    The construction, acquisition and operation of an auditorium is not a necessary expense, and the voters of the municipality must therefore approve a bond issue for such purpose. *Greensboro v. Smith,* 241 N.C. 363, 85 S.E. 2d 292.

Some jurisdictions, usually because of statutory and constitutional provisions, require that the ballot specifically state the purpose for which the bond proceeds will be used. *Johnson v. City of Muskogee,* 194 Okla. 513, 153 P. 2d 118; *Schnoerr v. Miller,* 2 Ohio St. 2d 121, 206 N.E. 2d 902; *Borin v. City of Erick,* 190 Okla. 519, 125 P. 2d 768; *Henson v. School District,* 150 Kan. 610, 95 P. 2d 346. In those jurisdictions the courts prohibit the expenditure of any funds except for the purposes specifically stated in the ballot.

North Carolina is one of the jurisdictions which permit the use of a broad and general ballot in bond elections. The statutory provisions as to the ballot require only that,

"A ballot shall be furnished to each qualified voter at said election, which ballot may contain the words 'for the ordinance authorizing $_____ bonds (briefly stating the purpose), and a tax therefor,' and 'against the ordinance authorizing $_____ bonds (briefly stating the purpose), and a tax therefor,' with squares in front of each proposition, in one of which squares the voter may make an (X) mark, but this form of ballot is not prescribed." G.S. 160-387 (e).

Similarly, the ordinance authorizing a bond sale and calling a special election must state the purpose in only "brief and general terms." G.S. 160-379 (b).

In most jurisdictions which permit the use of such broad and general referendum ballots, in determining whether there have been misrepresentations sufficient to void the bond election, the courts have consistently looked to the notice of election, the ballot, and the ordinance authorizing the issuance of bonds, i.e., matters which constitute official proceedings in connection with the bond issue.

The official ballot in *Sooner State Water, Inc. v. Town of Allen,* 396 P. 2d 654 (Okla. 1964) submitted to the voters con-

Sykes v. Belk

cerned only the issuance of $30,000 in bonds for acquiring and maintaining a water works system. A public letter from members of the City Council made some misrepresentations, but the misrepresentations were not made as a result of official board action. Holding that the misrepresentations did not void the election, the Oklahoma Supreme Court stated:

"We are of the opinion that this case is comparable to the case of *Reid v. City of Muskogee,* 137 Okl. 44, 278 P. 339. The first paragraph of the syllabus reads:

'Inducements held out or promises made by a so-called "citizens' committee" for the purpose of influencing voters in a municipal bond election are without any legal effect, and amount to no more than campaign argument which the voter could accept or not, and such inducements so offered, even if relied upon by the voters, do not constitute bribery, nor in any wise affect the validity of bonds otherwise legally voted.'

. . . .

". . . [W]e hold that campaign arguments presented in speeches, pamphlets or newspaper advertisements made by committees, organizations or individuals, which arguments have no official status, cannot be used as a basis for voiding an election. Misrepresentations sufficient to void an election must have an official origin, i.e., appear in some phase of the bond proceedings. Neither is it sufficient that such misrepresentations be made by some city official speaking or acting in his individual capacity, and when such misrepresentations constitute no part of the official proceedings. It is beyond the realm of reason that the validity of bond issues, regularly adopted by a vote of the people, should depend upon the character of campaign speech or advertisement initiated by some individual or group acting in an unofficial capacity."

In the case of *Detroit United Railway v. City of Detroit,* 255 U.S. 171, 65 L. Ed. 570, 41 S. Ct. 285, the City of Detroit, pursuant to its charter, passed an ordinance for the acquisition, ownership, maintenance and operation by the City of a street railway system, and submitted the proposition to the voters, who adopted this action by the required majority. The plaintiff attacked the actions of the City on the grounds that the voters

were misled by the fraudulent conduct of officials of the City in their effort to obtain its property by misrepresentations in a circular, and otherwise, as to the purpose and effect of the vote to be taken upon the question of acquiring the transportation system. The court, upholding the dismissal of plaintiff's bill in the District Court, stated:

"We think that the court below correctly held that the motives of the officials, and of the electors acting upon the proposal, are not proper subjects of judicial inquiry in an action like this so long as the means adopted for submission of the question to the people conformed to the requirements of the law. . . .

". . . We are of the opinion that this so-called official information, no complaint being made of it before the election, cannot vitiate the election when the same was had upon a submission within the authority of the city under its charter and the ordinance passed in the form shown."

In *Public Service Co. v. City of Lebanon,* 221 Ind. 78, 46 N.E. 2d 480, it is stated:

"Another proposition relied on by the appellant as ground for an injunction in its favor in case No. 27837, and for denying the appellee's application for an injunction in cause No. 27793, is that the purchase of the appellant's electric system was never authorized by the voters of the City of Lebanon, as required by § 48-7201, Burns' 1933. To sustain this contention it was established that in the campaign that immediately preceded the special election at which the proposal of purchase was submitted to the voters of said city, the mayor, common council and board of public works represented to the public in newspaper advertisements and handbills that not to exceed $150,000 would be expended to purchase said utility. No official commitment was made in the proceedings of the city council as to the amount of money that might be expended on said undertaking and the question submitted to the voters by the ballot used at said election contained no such limitation. It has not been charged that the election was void or that the voters were coerced. Under these circumstances it cannot be judicially declared that the election was not effectual to accomplish the purpose contemplated by the statute under which it was held. The courts may not go behind the result of an election to ascer-

Sykes v. Belk

tain the persuasions that motivated the voters. (Citations omitted.)"

In *Harrison v. Board of County Com'rs,* 68 Idaho 463, 198 P. 2d 1013, it is stated:

"On the question of whether the circulation of misinformation will invalidate an election, the rule is stated in Dillon on Municipal Corporations, 5th Ed., Sec. 213, p. 430, as follows:

" 'Inducements in the way of statements and representations made to influence a voter, although false and fraudulent, will not invalidate the election if it does not appear that by force and fraud the voter was compelled to vote in a way he did not wish to vote.'

"Misrepresentations by public officials and others will not vitiate an election. . . ."

In *Mills v. San Francisco Bay Area Transit District,* 261 Cal. App. 2d 666, 68 Cal. Rptr. 317, the voters approved a bond issue for the funding of a rapid transmit system. The ballot was in general form and described only in the most general terms the purpose of "acquiring, constructing, and operating a rapid transit system." Neither the resolution calling the bond election, the ballot, nor the notice of election specified the location of any station. However, a report was prepared by certain experts employed by the board which did mention a specific location of the station. Preceding the election the public was referred to this report. After the voters approved the bond issue, the Transit District decided to change the location of the station to a location one and one-half miles distant from the place mentioned in the report. Citizens brought suit to enjoin the building of the station at the new location on the ground that the voters had approved the location as set forth in the report. The court held for the Transit District, and stated:

"Obviously, the statutes, the notice of election and the ballot proposition itself contemplate a broad authority for construction of a three-county rapid transit system. In the wide scope of this substantial transit project, the deviation of 1½ miles in location of a single station is but a minor change in the tentative plan which was relied upon only to forecast feasibility of the project as a whole.

"Appellants refer to some statements 'disseminated to the general public' before the election. But these cannot be deemed to modify the intentionally broad language of the proposition in fact submitted to the voters, the call of election published to them, and the statutes authorizing the procedure adopted. (See *City of Los Angeles v. Dannenbrink,* 234 Cal. App. 2d 642, 655 [44 Cal. Rptr. 624].)"

Again, in the case of *Anselmi v. Rock Springs,* 53 Wyo. 223, 80 P. 2d 419, it is stated:

"In several cases, courts have considered the statements of officials in connection with an election, and it has been held that 'misrepresentations made during a campaign by public officials or others will not vitiate an election.' *West Missouri Power Co. v. Washington,* 10 Cir., 80 F. 2d 420; *City of Oswego v. Davis,* 97 Kan. 371, 154 P. 1124; *Detroit United Railway v. Detroit,* 255 U.S. 171, 41 S. Ct. 285, 65 L. Ed. 570; *State v. Waltner,* 340 Mo. 137, 100 S.W. 2d 342; *Kansas Electric Power Co. v. City of Eureka,* 142 Kan. 117, 45 P. 2d 877, 879; *Epping v. Columbus,* 117 Ga. 263, 43 S.E. 803, 812; *Balducci v. Strough,* 135 Misc. 346, 239 NYS 611."

In 43 Am. Jur., Public Securities and Obligations, § 80, p. 336, it is stated:

"Effect of Motives of Voters, Speeches, or Official Misinformation Preceding Vote.—The motives which induce voters to authorize the issuance of municipal bonds cannot be inquired into by the courts, when the propriety of becoming indebted for the purpose for which such bonds are issued has been committed to such voters by the legislature of the state.

Bonds issued under the authority of a popular election cannot be set aside simply because all that may have been said in public speeches during the canvass which preceded the election does not prove true; and official misinformation given to electors in advance of a vote upon a proposition for the municipal acquisition or ownership of a utility system, and the issuance of bonds for that purpose, cannot vitiate an election held in substantial compliance with the law, at least where no complaint regarding such misinformation is made before the election."

Sykes v. Belk

Accord: 116 A.L.R. 1250; *West Missouri Power Co. v. City of Washington, Washington County, supra; Harrison v. Board of County Commissioners, supra; Palmer v. City of Liberal,* 334 Mo. 266, 64 S.W. 2d 265; *Bowling v. City of Bluefield,* 104 W. Va. 589, 140 S.E. 685; *State ex rel Kellett v. Johnson,* 330 Mo. 452, 50 S.W. 2d 121; *Epping v. Columbus,* 117 Ga. 263, 43 S.E. 803; *McNichols v. City and County of Denver,* 101 Col. 316, 74 P. 2d 99; *Inslee v. City of Bridgeport,* 153 Neb. 559, 45 N.W. 2d 590.

Plaintiffs rely heavily upon the cases of *Borin v. City of Erick, supra,* and *Henson v. School District, supra.*

In *Borin,* the City Council adopted ordinances and submitted to the people a ballot which submitted the proposition of whether bonds in the sum of $60,000 should be voted for the construction of a power plant, and the official records show that the actual cost of the power plant was to be $110,000. The City Council hoped to obtain the balance by federal grant, but did not disclose this in the ballot or in any of its official records. The court enjoined the sale of the bonds.

*Borin* is distinguishable from instant case in that the Oklahoma Constitution, Art. 10, § 16, provides: "All laws authorizing the borrowing of money by and on behalf of the state, county or other political subdivision of the state, shall specify the purpose for which the money is to be used, and the money so borrowed shall be used for no other purpose." The court in reaching its decision in *Borin* reasoned that the ballot, ordinance and the official records did not inform the voters of the "exact and particular thing upon which they are called to vote and decide. The North Carolina Constitution contains no language similar to that contained in the Oklahoma Constitution. The case is further distinguishable because in the instant case there is no misleading statement or misrepresentation in the official ballot or official minutes.

In *Henson v. School District, supra,* a school board contemplated the construction of a building to cost $15,000, to be paid partially by a $6,500 bond issue and the balance by a federal grant. The ballot submitted to the voters stated the proposition as follows: "Shall the following be adopted: Proposition to issue bonds in the sum of $6500 for the purpose of building and equipping a school house?" The court in *Henson*

held that the notice and ballot did not sufficiently state the object for which the election was called. There, the court did not base its decision on campaign promises and arguments alone, but based its decision upon the official resolutions and minutes of the Council leading up to and inhering in the election.

Although not cited by plaintiffs in their brief, we find that the Nebraska Court, in the case of *May v. City of Kearney,* 145 Neb. 475, 17 N.W. 2d 448, applied the principle of equitable estoppel to facts somewhat similar to those in instant case. There a question was presented to the voters to determine whether the City should acquire a public utility property by eminent domain proceedings. The mayor and City Council took a great interest and active part in the pre-election campaign. The news media were used to express the views of the mayor and Council, including the representation that general obligation bonds would not be used to pay for the property condemned. The voters approved the proposal by a majority of 27 votes. After the election, the City Council passed an ordinance providing for the issuance of general obligation bonds to pay for the property. Plaintiffs brought action seeking permanently to enjoin the City from issuing the general obligation bonds. The Court, holding for plaintiffs, stated:

> " 'As a usual thing, the doctrine of equitable estoppel cannot be invoked against a municipal * * * corporation as to the exercise of governmental functions, but yet exceptions are to be made, and where right and justice demand it, the doctrine will be held to apply, particularly where, as is true here, the controversy is between one class of the public as against another class.' . . . 'The doctrine of estoppel may be invoked against a municipal corporation where there have been positive acts by the municipal officers which may have induced the action of a party and where it would be inequitable to permit the corporation to stultify itself by retracting what its officers have done, * * * .'

> " . . . [T]he doctrine of estoppel by representation is *ordinarily applicable only to representations as to facts either past or present,* and not to representations or promises concerning the future, there are well recognized exceptions where to enforce the rule would perpetuate a fraud

Sykes v. Belk

or cause injustice; and this doctrine of promissory estoppel has particular application when the representations relate to an intended abandonment of an existing right, and is made to influence others who have in fact been influenced by it and substantial injustice will result unless the promise is enforced. . . . "

The well recognized rules as to equitable estoppel in North Carolina are set forth in the case of *Boddie v. Bond,* 154 N.C. 359, 70 S.E. 824, as follows:

"1. Words or conduct by the party against whom the estoppel is alleged, amounting to a misrepresentation or concealment of material facts.

"2. The party against whom the estoppel is alleged must have knowledge, either actual or implied, at the time the representations were made, that they were untrue.

"3. The truth respecting the representations so made must be unknown to the party claiming the benefit of the estoppel at the time they were made and at the time they were acted on by him.

"4. The party estopped must intend or expect that his conduct or representations will be acted on by the party asserting the estoppel, or by the public generally.

"5. The representations or conduct must have been relied and acted on by the party claiming the benefit of the estoppel.

"6. The party claiming the benefit of the estoppel must have so acted, because of such representations or conduct, that he would be prejudiced if the first party be permitted to deny the truth thereof."

[2, 3] It is generally recognized in North Carolina that the doctrine of estoppel will not be applied against a municipality in its governmental, public or sovereign capacity. *State v. Bevers,* 86 N.C. 588; *Raleigh v. Fisher,* 232 N.C. 629, 61 S.E. 2d 897; *Candler v. Asheville,* 247 N.C. 398, 101 S.E. 2d 470. We think that the operation of a civic center would be a proprietory function, *Aaser v. Charlotte,* 265 N.C. 494, 144 S.E. 2d 610, but that the choice of the site by the City Council was a public or governmental function. However, it is not necessary to decide

in what capacity the City Council was acting, since the circumstances of this case do not present facts which require application of the doctrine of equitable estoppel.

[4] An estoppel involves a prejudicial misleading. *Hospital v. Stancil,* 263 N.C. 630, 139 S.E. 2d 901.

In *May v. Kearney, supra,* the mayor and City Council made unqualified representations that no general obligation bonds would be issued. After the election, the City Council passed an ordinance providing for the issuance of such bonds, which would of necessity have had a prejudicial effect upon the plaintiff taxpayers.

[7] In instant case the manifest purpose for which the civic center bond issue was proposed was to revitalize downtown Charlotte, with the civic center becoming the catalyst for other projects. The site finally chosen by the City Council remained in downtown Charlotte, a distance of approximately four blocks from the "Brevard Street" site. We do not think that this amounts to a substantial deviation from the purpose for which the bonds were proposed. There is no showing that plaintiffs were *prejudicially* misled.

[5] It is the general rule that every reasonable presumption will be indulged in favor of the validity of elections, and the courts will uphold the validity of municipal bond elections unless clear grounds are shown for invalidating them. *Jamison v. Charlotte,* 239 N.C. 682, 80 S.E. 2d 904; *Gardner v. City of Reidsville,* 269 N.C. 581, 153 S.E. 2d 139; 43 Am. Jur., Public Securities and Obligations, Sec. 78, p. 335; McQuillin on Municipal Corporations (3d ed.) Vol. 15, Sec. 40.16.

[7] The record fails to show that enough voters relied on the representations as to the site of the civic center to change the result of the election. The facts are not such as to require this Court to infer that a sufficient number of voters were misled. *Nickel v. School Board of Axtell,* 157 Neb. 813, 61 N.W. 2d 556; *Talbott v. City of Lyons,* 171 Neb. 186, 105 N.W. 2d 918. See also 1 A.L.R. 2d 350; *Gordon v. Commissioners' Court of Jefferson County,* 310 S.W. 2d 761 (Texas 1958) ; *Scott v. City of Orlando,* 173 So. 2d 501 (Fla. Dist. Ct. App. 1965).

[6] The courts will not interfere with the exercise of discretionary powers of a municipal corporation unless its actions

are so unreasonable and arbitrary as to amount to an abuse of discretion. *Burton v. Reidsville,* 240 N.C. 577, 83 S.E. 2d 651; *Housing Authority v. Wooten,* 257 N.C. 358, 126 S.E. 2d 101.

[7]    Applying the authorities above set forth, we conclude that the misrepresentations made as to the site of the civic center did not vitiate Question No. 1 as submitted to the voters of Charlotte in the bond issue election held on 12 December 1969.

Plaintiffs contend that the trial court erred in denying their timely made motion for jury trial.

[8]    North Carolina Constitution, Art. I, § 19, guarantees to every person the "sacred and inviolable" right to demand a jury trial of issues of fact arising in all controversies at law respecting property.

[9]    A party may waive his right to jury trial by (1) failing to appear at the trial, (2) by written consent filed with the clerk, (3) by oral consent entered in the minutes of the court, (4) by failing to demand a jury trial pursuant to G.S. 1A-1, Rule 38(b). Art. IV, § 12, North Carolina Constitution; *Driller Co. v. Worth,* 117 N.C. 515, 23 S.E. 427.

[10]    In instant case the parties on 15 June 1970 stipulated:

"(1) This case was called for a Show Cause hearing before the Honorable T. D. Bryson, Jr., Judge Presiding over a Special Criminal Term of the Superior Court of Mecklenburg County on June 10, 1970, at which hearing it was stipulated that the Court would accept documentary evidence, including exhibits, affidavits, briefs, and all other documents which counsel for both parties desired to submit to the court.

"(2) The Court would consider the said documentary evidence submitted, along with the complete Court file, and make findings of facts and render a Judgment thereon out of term and out of district; and that a Judgment may be rendered even though the Judge its assigned to a criminal term of Court at this time and during the period of time which he may be considering the documents submitted to him."

On 30 June 1970 plaintiffs demanded a jury trial.

On 24 August 1970 the parties further stipulated:

"1. That the hearing held on June 10, 1970 was duly and regularly held and that the Honorable T. D. Bryson, Jr. was duly assigned and commissioned to hold the said Court; that the Court was duly constituted and the holding thereof was in all respects regular.

"2. That the following documents were placed before the Court at the said hearing, with the exception of Defendants' Exhibit 'O,' said Exhibit consisting of an affidavit requested by the Court after the date of the hearing, and with the exception of the speech dated October 15, 1969 listed in Exhibit 'B' and the map listed as Exhibit 'E' of Plaintiffs' exhibits; and that all of these documents may be entered into evidence and are duly before the Court, and may be considered as evidence when the Court makes a ruling and final order on the merits of this case."

These written stipulations were filed with the clerk and appear in the record in this cause. *Hahn v. Brinson*, 133 N.C. 7, 45 S.E. 359.

Any doubt that the parties intended to waive a jury trial by writings filed in the cause is resolved by that portion of the agreed "Statement of Case on Appeal" which states:

"This case was decided by the Honorable T. D. Bryson, Jr. upon documentary evidence, without argument of counsel, and his ruling was accepted as a final Order according to stipulations of the respective counsel which are filed in this cause and which are binding upon both parties. This Appeal will, then, be based upon the documentary evidence which is of record in this case and which was accepted as evidence before Judge Bryson at or prior to the time that he entered his final Order on August 27, 1970."

Further, an examination of the record reveals that at the time the trial judge entered final judgment and denied plaintiffs' motion for a jury trial, the parties had by stipulation and judicial admission admitted facts sufficient to support a judgment determining the rights of the parties under the applicable law. Thus, without submitting the case to the jury, the court

Sykes v. Belk

properly found facts, made conclusions of law, and entered final judgment. *Bank v. Jones,* 205 N.C. 648, 172 S.E. 185.

The court correctly denied plaintiffs' motion for a jury trial.

[11]   Plaintiffs' motion to amend their complaint related to their right and standing to bring this action. The judgment entered was not based on plaintiffs' standing to sue, and defendants in their brief expressly abandoned any contention that plaintiffs lack standing to sue. Thus there can be no prejudice to plaintiffs in denial of this motion.

[12]   Neither do we find merit in the contention that the trial judge erred when he refused to adopt the findings of fact tendered by plaintiffs. The facts found by the trial court are supported by the evidence and are sufficient to support the judgment. There was no error in the court's refusal to make further findings of fact which are immaterial and which would not call for a different conclusion. *Insurance Co. v. Insurance Co.,* 266 N.C. 430, 146 S.E. 2d 410.

We have carefully considered plaintiffs' remaining assignments of error. We find no prejudicial or reversible error.

The judgment of the trial court is

Affirmed.